## In re R.B., Juvenile

[566 A.2d 1310]

No. 87-383

Present: **Allen C.J., Peck, Gibson and Dooley, JJ.**

Opinion Filed August 4, 1989

Motion for Reargument Denied August 31, 1989

416

*Jeffrey L. Amestoy*, Attorney General, and *Elizabeth J. Grant*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.*, Defender General, and *Henry Hinton*, Appellate Defender, Montpelier, for Defendant-Appellee.

*Carlyle Shepperson* of *Martin & Paolini, P.C.*, Barre, for Defendant-Appellant.

**Dooley, J.** This is an appeal from a juvenile court order transferring custody, guardianship, and residual parental rights and responsibilities of R.B. from her mother,[1] V.A., to the Commissioner of Social and Rehabilitation Services (SRS). Appellant V.A. raises six issues here: (1) she was denied procedural due process, (2) the procedures used could not have resulted in a decision based on clear and convincing evidence, (3) her motion to dismiss the petition to terminate was erroneously denied, (4) she was denied discovery, (5) the district court's findings of fact and the standard used to terminate her parental rights were erroneous, and (6) the termination of her parental rights violated her substantive due process rights. We affirm.

The trial court made extensive findings of fact, summarized below:

In February, 1983, R.B., then six years old, and four of her siblings were taken into state custody under an emergency detention order based on allegations of beatings by V.A., and physical and sexual abuse by V.A.'s live-in boyfriend. SRS social workers picked up the children at the home, which was in a dirty and unhealthy condition. After being examined at a hospital emergency room, the children were placed in foster care. All the children seemed relieved to be removed from the home. Each child described ritualistic beatings by the mother and her boyfriend, and of being forced to stand in a corner for hours. In March, R.B. told her foster mother and social worker she did not want to return home because she was afraid of further beatings.

---

[1] R.B.'s father, never married to V.A., was notified of the proceedings and chose not to attend. The father admitted paternity and surrendered his parental rights.

Later that spring, R.B.'s psychological evaluations were completed. A report by Dr. Erwin Stunkel of the Orange County Mental Health Services stated:

> R.B. seems to be an alert, lovely little girl with much potential.... In terms of the best custody arrangements for her, she apparently would like to stay with her siblings in a foster home. Her expressed extreme fear of returning to her mother appears to be a fear of both her mother and [the boyfriend] rather than just [the boyfriend].
>
> . . . .
>
> I must concur with [the] assessment as to the *unusual* consensus, and attachments, which exist among these five children.... I believe that these children would not show the severe behavioral symptoms and general distrust of their mother and others that they do, had she not totally approved of and participated in the severe beatings of them by [the boyfriend]. From the children's reports of her behavior, she seems to consistently act in an egocentric and irritable manner, choosing to ignore, exploit, and attack the children instead of nurturing and protecting them. These five children seem to protect and nurture each other because they have lost (or never had) basic trust in their mother's ability to be interested in meeting their needs. (Emphasis in original.)

At the merits hearing on March 21, however, the court concluded that R.B. had been subject to corporal punishment, not physical abuse, and the children were returned to V.A. Arrangements were made for the children's attorney and their guardian ad litem to visit the home to assure they were being properly cared for.

During a visit on July 6, 1983, the attorney and the guardian ad litem discovered bruises on R.B.'s buttocks and thighs. R.B. was taken to a hospital emergency room, where it was determined that the injuries were a result of numerous beatings administered with a paddle and a crib slat. The court again issued an emergency detention order placing R.B. in state custody. In addition, the State filed criminal charges of simple assault against V.A. and the boyfriend.

Detention of R.B. with SRS continued through the summer and fall of 1983 while the court litigated whether R.B. was a child in need of care and supervision. SRS placed R.B. in

a foster home. On July 8, 1983, the other children in V.A.'s home were examined and one of R.B.'s sisters was taken into SRS custody. SRS implemented a case plan designed to improve V.A.'s parenting skills. The plan included weekly visitation with R.B. at either the SRS office or the foster home, therapy with a family psychologist, and participation in Parents Anonymous. Except for visitation with R.B. at the SRS office, V.A. refused to cooperate with SRS.

At the first visit between R.B. and V.A. on September 21st, V.A. did not show any affection towards R.B. R.B. did not show any affection towards her mother, seemed reluctant to be in contact with her, and spoke only when questioned.

At the merits hearing on October 31, 1983, all parties stipulated that R.B. was a child in need of care and supervision in exchange for the dismissal of the criminal charges. On November 14, 1983 the court entered an order finding R.B. to be a child in need of care and supervision based on the stipulation. After further hearings, the parties stipulated to a disposition order placing custody of R.B. with SRS, and the court entered such an order on January 27, 1984. The court included a provision that the order could be reviewed after thirty days with the burden of proof allocated "as with normal disposition hearing." In March, V.A. moved for review of the disposition order, challenging only the failure to allow her weekly visitation with R.B. This review hearing, initially scheduled for May, was continued several times, but never held.

Except for a few times in the summer of 1984, V.A. did not contact R.B. outside of visits scheduled by SRS.[2] These visits continued to be characterized by V.A.'s lack of attention and physical affection, use of abusive and profane language, and refusal to supervise R.B. or the other children. R.B. became increasingly anxious and agitated by the visits with V.A. At one point, R.B. received therapy related to fears of being returned home to V.A.

---

[2] SRS initially placed R.B. with a foster family in Peacham, in part because the home was close to V.A.'s residence, and that would encourage visitation and reunification of the family.

In August, 1984, V.A. cancelled the supervised visits. In September, after a violent argument with the live-in boyfriend, V.A. abandoned the home, carrying one infant child with her. The State took custody of the remaining five children,[3] where at least two remain. V.A. was alleged to have abused the children by hitting their heads against a door casing, stomping on their feet, and hitting them with a plastic baseball bat. After the breakup of the home, V.A. disappeared for several weeks, making no contact with R.B., her foster family, or SRS until December.

SRS noticed and scheduled a dispositional review for February 28, 1985. The hearing date was changed to March 20, then continued by stipulation of the parties. This hearing was never held. V.A. did not object, even though she was fully informed through counsel.

Throughout R.B.'s placement in foster care, SRS conducted semiannual reviews and modification of the case plan with V.A., who continued to refuse to participate meaningfully. V.A. made essentially no improvement in her parenting skills. R.B., however, thrived while in foster care, with marked improvement in her social and psychological development. R.B., her therapists, social worker, and foster family all believe she will continue to improve if she is not forced to return to her mother.

In June, 1986, based on V.A.'s apparent inability to resume parenting of R.B. within a reasonable time, the State moved for termination of parental rights and responsibilities, including consent to adoption. A full hearing was held on July 3, 1987. The trial court found, by clear and convincing evidence, that it was in the best interests of R.B. to transfer residual parental rights to SRS.

We note at the outset that the primary purpose of Vermont's laws on juveniles is "to provide for the care, protection and wholesome moral, mental and physical development of children." 33 V.S.A. § 631(a)(1); *In re H.A.*, 148 Vt. 106, 108, 528 A.2d 756, 757 (1987). Thus, our primary concern must be with the welfare of the child. *In re Rathburn*, 128 Vt. 429, 434, 266 A.2d 423, 426 (1970).

---

[3] Another child was born to V.A. sometime after R.B. was taken into state custody.

■ In any juvenile proceeding, however, all the parties involved are to be accorded a fair hearing, "and their constitutional and other legal rights recognized and enforced." 33 V.S.A. § 631(a)(4). Because "the freedom of children and parents to relate to one another in the context of the family, free of governmental interference" is a fundamental liberty, *In re N.H.*, 135 Vt. 230, 236, 373 A.2d 851, 856 (1977), the courts are constrained to achieve the statute's stated purpose "whenever possible, in a family environment, separating the child from his parents only when necessary for his welfare." 33 V.S.A. § 631(a)(3); see also *In re H.A.*, 148 Vt. at 108, 528 A.2d at 757. Thus, at a merits hearing, the burden is upon the State to show, by a preponderance of the evidence, that a child is in need of care or supervision by establishing that the child has either been abandoned or abused, or is without proper parental care or subsistence necessary for his well-being. 33 V.S.A. § 632(a)(12); *In re A.D.*, 143 Vt. 432, 435, 467 A.2d 121, 123 (1983). In proceedings to terminate parental rights, the State has a greater burden of showing, by clear and convincing evidence, that there is no reasonable possibility that the "causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time." *In re D.R.*, 136 Vt. 478, 481, 392 A.2d 951, 953 (1978).

V.A.'s first and third arguments are interrelated. She argues that she was denied procedural due process because the court failed to hold a review hearing between March of 1984, when it was requested, and the hearing on the motion to terminate parental rights in 1987. She further argues that the proper remedy for this violation of her rights is dismissal of the juvenile proceeding in which her parental rights were terminated or suppression of all evidence relating to her or R.B. between 1984 and 1987. We hold that there was no violation of her rights and, in any event, that the remedy fashioned by the trial court to respond to the delay in holding the review hearing was adequate for any violation of V.A.'s rights that occurred.

We emphasize that we do not condone the procedure used in this case. The apparent "indiscriminate use of continuances" led to a situation where the court lost track of the case, and hearings to adjudicate important rights were never held. See *In re L.S.*, 147 Vt. 36, 40, 509 A.2d 1017, 1020 (1986); *In re*

*R.S.*, 143 Vt. 565, 570, 469 A.2d 751, 754 (1983). As a result, there was inadequate judicial supervision of this case.

Our primary reason for denying V.A. relief is that the provision of the January, 1984 order is invalid under our decision in *In re A.A.*, 134 Vt. 41, 349 A.2d 230 (1975). In *A.A.*, this Court reviewed a disposition order that transferred custody of the juvenile to SRS and provided for automatic review on a date approximately six months later. After the review hearing, the juvenile court amended the disposition order to transfer parental rights. This Court reversed, holding that the initial disposition order could be amended only on a showing of changed circumstances, the grounds for modification specified in 33 V.S.A. § 659(a). We held that no statutory authority existed for the automatic review provision of the disposition order and noted that: "the law seeks . . ., in the best interests of the child, to insure not only a speedy disposition of the proceedings . . . but also a final disposition, subject only to specifically enumerated time limitations . . . and modification procedures . . . which were not followed here." *Id.* at 43, 349 A.2d at 232 (citations omitted).

■ The disposition order in this case allowed the parties to reopen the order *for any reason* and *at any time after thirty days* and to require a full disposition hearing as if the first hearing and order never existed. We cannot find that such an order is consistent with the court's duty to order disposition "most suited to the protection and physical, mental and moral welfare of the child." 33 V.S.A. § 656(a). The reopening provision meant that the disposition order was only temporary and subject to relitigation at any time. It placed R.B. in a state of continuing limbo rather than creating a stable living arrangement, as the law requires. Further, the order cannot be reconciled with the Legislature's concern that disposition orders follow shortly after the merits determination, as evidenced by the requirement that the disposition hearing be held no later than thirty days after the merits hearing. See 33 V.S.A. § 654(b). While we can appreciate that the court accepted the reopening provision to facilitate a settlement of a contested disposition proceeding, we believe it was beyond the power of the court, as we held in *A.A.*

■ Because the reopening provision was invalid, no action could be taken pursuant to the provision. See *In re A.A.*, 134 Vt. at 43–44, 349 A.2d at 232. Thus, the failure of the court to schedule a hearing on V.A.'s motion to reopen could not result in a denial of V.A.'s rights.

Even if we accepted the argument that the reopening provision of the January 27, 1984 order was valid, we could not agree to the relief sought by V.A. The trial court in this case struck the January 27, 1984 disposition order, because of the failure to hold the review hearing, and made SRS go forward with a new disposition hearing under 33 V.S.A. § 655 as if no former disposition order had been entered. Thus, SRS had the burden of proof not only on its request for termination of parental rights but also to justify its continuing custody of R.B. if termination were not ordered.

Even if we thought a more extensive remedy for V.A. were possible, we would not find it appropriate in this case. V.A. agreed to the continuances of her March, 1984 motion to review the disposition order, as well as the continuances of SRS's requested dispositional review hearing, and made no effort to have them heard when it was clear that the court had lost track of the motions. The March, 1984 motion was based exclusively on a dispute over Saturday visitation. While differences over visitation apparently continued, the visitation schedule was changed over time to accommodate V.A. and R.B. Thus the specific visitation dispute that gave rise to the motion became moot as the schedule changed. In any event, it would not be appropriate to remedy the visitation dispute by returning custody of R.B. to V.A.

■ Further, we do not believe that the type of remedy V.A. seeks could be appropriate for the type of denial of rights she asserts occurred here. The merits and disposition stages of juvenile proceedings are separate. See *In re L.S.*, 147 Vt. at 38, 509 A.2d at 1019. A denial of rights at the disposition stage cannot give rise to a dismissal of the entire CHINS case. Nor can we apply a suppression remedy to a disposition proceeding where our main goal is to protect the interests of the child. See *In re Neglected Child*, 130 Vt. 525, 531, 296 A.2d 250, 254 (1972) (proceedings are "entirely concerned with the welfare of the child"). Use of such a remedy would elevate the parent's

rights over those of the child to the point where serious damage could be done to the child.

V.A.'s second claim is that admission of certain hearsay evidence caused the court to reach a conclusion that could not be based on "clear and convincing evidence" as required by *In re A.D.*, 143 Vt. at 435, 467 A.2d at 123, and *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982), for termination-of-parental-rights proceedings. The governing statute for this proceeding, 33 V.S.A. § 655(d), provides that in disposition hearings "all information helpful in determining the questions presented" may be admitted and used even if not admissible in a merits hearing. While we have been critical of overuse of hearsay in disposition determinations of unfitness, see *In re R.L.*, 148 Vt. 223, 228, 531 A.2d 909, 912 (1987); *In re Y.B.*, 143 Vt. 344, 348, 466 A.2d 1167, 1169 (1983), our recent decision in *In re C.L.*, 151 Vt. 480, 487, 563 A.2d 241, 246 (1989), makes clear that hearsay evidence is admissible in making a disposition determination to terminate parental rights as long as there was credible, nonhearsay evidence of parental unfitness. This case is very similar to *C.L.* The disposition hearing stretched over five days and involved ten witnesses, including two social workers, a psychiatrist and a psychologist. The hearsay introduced had a relatively minor role in the court's conclusions.

■ V.A.'s argument that reliance on hearsay evidence can never meet the burden of proof of "clear and convincing evidence" is impliedly rejected by *C.L.* We reject it as confusing issues of admissibility with the weight of the overall evidence on which the court may rely. If the juvenile court finds that hearsay evidence has sufficient probative value, in combination with other evidence, to meet the State's burden by clear and convincing evidence, the court may use it as here to support its conclusion that parental rights must be terminated.

■ V.A.'s fourth claim is that she was denied essential discovery to prepare and present her case. This claim relates to a request for all information held by the State with respect to the investigation of a sexual assault on R.B. during 1983 at her first foster home placement. The record shows a great deal of skirmishing over this request because the State took

the position that the information was part of the registry of child abuse investigations and was confidential under 33 V.S.A. § 686(d). The State's claim led to two in camera examinations of records by the trial court. At the first, the court concluded that the basic summary of the investigation contained nothing that V.A. did not already know. At the second, the court indicated that the investigative reports contained material that might be relevant and the material was turned over to V.A. While the disclosure came after all the evidence was in, the court indicated that V.A. could put in additional documentary evidence or ask to reopen the evidence for additional testimony. V.A. never sought to put in additional evidence as a result of the file disclosure. Thus, we do not believe that defendant has shown any prejudice from the delay in discovery, and we find no error, without resolving whether the information was privileged. See *In re R.M.*, 150 Vt. 59, 64, 549 A.2d 1050, 1053 (1988) (absent a "showing of prejudice," no error in denial of sanctions for failure to respond to discovery).

▉ V.A.'s fifth claim relates to the weight of the evidence and the court's findings. V.A. apparently argues that the claim is that the findings are inadequate because they fail to deal with important parts of V.A.'s evidence and, in any event, they do not support the court's conclusions. Findings of fact must stand if there is any credible evidence to support them. *In re H.A.*, 148 Vt. at 109, 528 A.2d at 757. The court in this case issued 121 findings, many taken from evidence offered by V.A. The findings detail the circumstances that gave rise to the SRS intervention in 1983 as well as all interactions between R.B. and V.A. They rely heavily on the testimony of the mental health professionals given in the case. They clearly meet our requirement for findings in support of termination orders. See, e.g., *In re M.B.*, 147 Vt. 41, 44–45, 509 A.2d 1014, 1017 (1986).

In reaching its conclusions, the juvenile court made clear that it was using a standard of proof of clear and convincing evidence. The conclusions are based on 33 V.S.A. § 667, which sets forth the factors to be considered in determining whether to terminate parental rights. See *In re C.W.*, 148 Vt. 282, 284, 532 A.2d 566, 568 (1987); *In re J.J.*, 143 Vt. 1, 3, 458 A.2d 1129, 1130 (1983). In evaluating these factors, the court

concluded that R.B. and V.A. have "no positive interaction whatsoever" but that the interactions between R.B. and her foster parents have been positive; that R.B. has adjusted well to her foster home and school; that it was "highly unlikely" that V.A. could resume parental duties within a reasonable period of time; and that V.A. plays no constructive role in R.B.'s welfare. Thus, the court could conclude that V.A. was an unfit parent demonstrably incapable of providing an appropriate home for R.B. See *In re L.S.*, 147 Vt. at 38, 509 A.2d at 1019. The conclusions are fully supported by the evidence and must stand.

■ V.A.'s final claim is that the State's power to terminate parental rights deprives V.A. of substantive due process of law. We noted in *In re A.D.*, 143 Vt. at 435, 467 A.2d at 124, that the State intervenes in the area of child neglect "as *parens patriae* to the child; it has a legitimate and compelling interest in the safety and welfare of the child." Thus, the ability to separate a neglectful parent from a child has been recognized as a legitimate state interest which can constitutionally overweigh the interest of the parent. See *In re Neglected Child*, 130 Vt. at 531, 296 A.2d at 254. The State's power to intervene to protect a child, and if necessary to terminate the parent-child relationship, does not deny the parent substantive due process. See, e.g., *In re William L.*, 477 Pa. 322, 329–39, 383 A.2d 1228, 1231–37 (1978).

*Affirmed.*