571 A.2d 627 (1989)
In re M.C.P., Juvenile.
No. 87-074.
Supreme Court of Vermont.
December 8, 1989.
*629 Jeffrey L. Amestoy, Atty. Gen., Montpelier, and Michael O. Duane, Asst. Atty. Gen., Waterbury, for plaintiff-appellee.
Valsangiacomo, Detora, McQuesten, Rose & Grearson, Barre, for defendant-appellant R.P.
Nancy J. Creswell of Paterson & Walke, Montpelier, and Marc Eagle, Tunbridge, for defendant-appellant D.P.
David Putter of Saxer, Anderson, Wolinsky & Sunshine, Montpelier, for collateral appellant E.P.
Before ALLEN, C.J., PECK and DOOLEY, JJ., and BARNEY, C.J. (Ret.), Specially Assigned.
DOOLEY, Justice.
The mother and father, D.P. and R.P. (parents), appeal the juvenile court's finding that their adopted daughter M.C.P. (juvenile) is a child in need of care and supervision and the court's disposition order granting legal custody to the Department of Social and Rehabilitation Services. The mother, D.P., argues: (1) the parties seeking termination of parental rights failed to comply with the notice requirement of the Indian Child Welfare Act, 25 U.S.C. § 1912(a) (1982 & Supp. IV 1986), even though the trial court knew that the juvenile was an Indian child; (2) the trial court failed to issue timely merits findings prior to the disposition hearing and failed to issue disposition findings; (3) the trial court failed to issue timely written findings after the merits and disposition hearings, and as a result, D.P. was denied her statutory right to a speedy resolution of this dispute; (4) the findings of fact by the trial court are unsupported by the evidence and are so flawed as to be clearly erroneous; and (5) the disposition order violates her Fifth Amendment privilege against self-incrimination because it requires her to admit abuse of the juvenile in order to regain custody of her child. The father, R.P., adopts by reference the mother's arguments and argues in greater detail the findings of fact issue. The brother of the juvenile, E.P., also raises several issues on *630 appeal. We remand, instructing the juvenile court to notify the Mohawk Indian Tribe for the purpose of determining whether the juvenile is a member of that tribe. Should the Indian Child Welfare Act not apply, we affirm the merits and disposition orders after deleting a phrase from the disposition order. In response to E.P.'s appeal, we order that a paragraph of the order relating to E.P. be stricken.

I.
The following is a condensed version of the facts and the history of this case. The discussion of each issue is accompanied with a more detailed factual statement relevant to that issue. The juvenile was born in Massachusetts in 1974. During her early years, she was physically and sexually abused by her natural parents. At the age of five, the Massachusetts social services agency removed the juvenile from the home of her natural parents and placed her in the foster care of several families and finally with D.P. and R.P. The juvenile's natural brother, E.P. (brother), was also removed at that time and placed with D.P. and R.P. The juvenile and her brother were adopted by D.P. and R.P. in 1984. A short while later, the family moved from Massachusetts to Vermont.
In November of 1986, the juvenile ran away from her home by jumping from a second story window and went to a neighbor's house. She told the neighbor that she had been physically and sexually abused by her adoptive parents. The neighbor called the police who took the child into custody. Temporary custody was granted to the Department of Social and Rehabilitation Services (SRS) following a detention hearing. In December of 1986, a hearing on the merits was held and the court determined that the juvenile was a child in need of care and supervision (CHINS). That determination was made on a form entitled "Findings and Order" and contained as findings of fact: "as set forth in the petition and affidavit." The reference was to a petition and brief affidavit submitted by SRS on November 23, 1986.
A disposition hearing was held in January, 1987 after which the court granted legal custody to SRS with residual parental rights and responsibilities remaining in the parents. There were no disposition findings.
After the appeal was filed, the parties stipulated to a remand for additional evidence. Following an additional hearing, the court issued findings of fact and conclusions of law again adjudicating that the juvenile was a CHINS and again placing custody with SRS.
Visitation disputes led to a contempt petition by the parents in December of 1987. The parties agreed that the hearing on the petition could be used to fashion a disposition order to cure the lack of disposition findings. On April 11, 1988, the court issued findings and conclusions relating to disposition. The disposition order retains custody with SRS and allows visits by the parents only if the juvenile desires them.
The disposition order also provided for visitation between the juvenile and her brother, E.P., "in a controlled setting by SRS." At that point, the brother sought to intervene to oppose forced visitation between him and the juvenile. The court allowed the intervention and issued an order giving the brother partial relief. He has appealed the order to this Court.

II.
Appellants' first claim of error is that the trial court failed to comply with the notice requirement of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963 (1982 & Supp. IV 1986). This is the first time we have had occasion to examine the ICWA.
During the late 1970's, Congress became concerned that "an alarmingly high" number of Indian families were being broken up by nontribal agencies who removed the children from their families and often placed them in non-Indian homes and institutions. 25 U.S.C. § 1901(4). In most instances, the children were being removed from their families "on such vague grounds as `neglect' or `social deprivation,'" and it was only on rare occasions *631 that the Indian children were removed because of physical abuse. H.R.Rep. No. 1386, 95th Cong. 2d Sess. 10, reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7532. Members of Indian communities who had regarded these children's parents as excellent caregivers were often shocked to learn that the parents had been found unfit by non-Indian social workers. Id. Congress concluded that the states "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families" during child custody proceedings. 25 U.S.C. § 1901(5).
Pursuant to its plenary power over Indian affairs, Congress enacted the ICWA in 1978 in order to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902. Congress achieved these goals by establishing "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." Id. The clear policy of the ICWA is that Indian children should remain in the Indian community. See Mississippi Band of Choctaw Indians v. Holyfield, ___ U.S. ___, ___, 109 S.Ct. 1597, 1602, 104 L.Ed.2d 29 (1989).
In essence, the minimum standards established by Congress to promote the best interests of Indian children follow two different schemes. First, in many instances, the jurisdiction of Indian child custody proceedings[1] is transferred from the state court to the Indian child's tribe. 25 U.S.C. § 1911(b). In cases where the Indian child is not a resident of his or her tribal reservation, the state may retain jurisdiction over the child only by a showing of "good cause," an objection to the transfer by either parent, or a declination of jurisdiction by the tribe. Id. Second, when the custody proceeding remains in the state court, the tribe can intervene as a party, and the ICWA sets out standards that must be met before an Indian child can be placed in foster care or before parental rights can be terminated. Id. § 1912(e), (f). The ICWA also establishes "preferences" for the placement of the Indian child. Id. § 1915.
Because of the tribe's extensive rights in an Indian child custody proceeding, the ICWA requires that notice be given to the child's tribe of the pending proceeding and of the tribe's right of intervention. Id. § 1912(a). Specifically, the Act requires that:
In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon *632 request, be granted up to twenty additional days to prepare for such proceeding.
Id. The trial court never provided notice as required under this section. The parents in this case claim that this case falls within the ICWA and that § 1912 required the trial court to notify the appropriate Indian tribe.
In order to evaluate this claim, we must examine the limits of ICWA applicability. Although the ICWA provides broad protections in child custody cases, there are limits to its applicability. By their terms, most of the provisions of the Act apply only to Indian children. Thus, before the ICWA can be invoked, it must first be established that the child is an Indian child as defined in the Act. An Indian child "means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Id. § 1903(4). An Indian tribe is defined as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians." Id. § 1903(8). The Bureau of Indian Affairs of the Department of the Interior publishes a list of "Indian Tribal Entities Within the Continguous 48 States Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs." 53 Fed.Reg. 52,829-55,835 (Dec. 29, 1988).[2]
The facts relevant to the definitions are as follows. During the temporary detention hearing on December 1, 1986, and again during the merits hearing on December 16, 1986, the trial court was informed on numerous occasions that both the juvenile and her adoptive parents are of Native American Indian origin. The juvenile testified during the merits hearing that she is a full-blooded Micmac Indian. In addition, the juvenile's father, R.P., testified that he is Mohawk Indian and that his people were from the St. Regis Reservation in New York. With respect to the juvenile, the father testified that while she is not currently a member of the Mohawk Tribe, she could be eligible for membership in the tribe. The trial court found that the Micmac Indians were not eligible for services from the Bureau of Indian Affairs, and, therefore, did not qualify as an Indian tribe under § 1903(8) of the Act. Further, the court found that the juvenile was not a member of the Mohawk Tribe. Thus, the court concluded that the juvenile did not meet the definition of an Indian child under the ICWA.
We have no doubt that the trial court's determination was correct based on the limited evidence before it. The child can qualify as an Indian child in one of two ways. The child can be a member of an Indian tribe. See 25 U.S.C. § 1903(4). The evidence here is that the juvenile is a member of the Micmac Tribe but that tribe is "unrecognized" in the United Statesthat is, it is not eligible for services from the Secretary of the Interior.[3] Thus the Micmac Tribe does not meet the definition of a tribe in § 1903(8), and membership in this tribe does not confer Indian child status on the juvenile. See 4 J. McCahey, M. Kaufman & C. Kraut, Child Custody & Visitation Law and Practice § 29.03[3], at 29-24 (1989) (unrecognized tribes not covered by ICWA). While the Mohawk Tribe is recognized, the evidence here is that the juvenile is not a member.
The second way to qualify as an "Indian child" is that the juvenile can be the biological child of a member of a tribe and be eligible for membership. The parents *633 involved in the proceeding are not the biological parents of the juvenile. Thus, the evidence that the father is a member of the Mohawk Tribe and the juvenile is eligible to be a member does not meet the statutory requirement. The juvenile's biological father is a Micmac Indian. His membership does not aid the argument that the juvenile is an Indian child because the Micmac Tribe is unrecognized.
The conclusion, based on the evidence available, that the juvenile is not an Indian child does not, however, end the inquiry. The notice provision, 25 U.S.C. § 1912(a), applies not only when the trial court finds the juvenile is an Indian child but also when the court "has reason to know that an Indian child is involved." This language reflects the fact that Indian tribes have an interest in Indian child welfare proceedings apart from the parties and that the information provided by the parties bearing on whether the juvenile is an Indian child may be incomplete. It also reflects the fact that Indian tribes are in a better position to determine the membership of individuals who have some relationship to the tribe and the court should defer to this expertise.[4]
The Bureau of Indian Affairs of the United States Department of Interior has issued "Guidelines for State Courts; Indian Child Custody Proceedings," covering the notice obligation among other ICWA issues. 44 Fed.Reg. 67,584 et seq. (Nov. 26, 1979). The Guidelines set forth five circumstances where the Bureau of Indian Affairs concludes that a state court "has reason to believe a child involved in a child custody proceeding is an Indian": (1) where the court is directly informed the child is an Indian child; (2) where a public or licensed private agency has information which suggests that the child is an Indian; (3) where the child states that he or she is an Indian; (4) where the residence or domicile of the child, his or her biological parents or an Indian custodian is known or shown to be a "predominantly Indian community"; and (5) where an officer of the court has knowledge that the child may be an Indian child. Guideline B.1.(c)(i)-(v), 44 Fed.Reg. 67,586 (Nov. 26, 1979). The list is intended to be noninclusive. The commentary to the Guidelines states that "the best source of information on whether a particular child is Indian is the tribe itself." Commentary to Guideline B.1. It further notes that list of circumstances "is not intended to be complete, but it does list the most common circumstances." Id.
The Guidelines do not have "binding legislative effect," 44 Fed.Reg. 67,584 (Nov. 26, 1979), and have been described as "nonbinding." Mississippi Band of Choctaw Indians v. Holyfield, ___ U.S. at ___ n. 26, 109 S.Ct. at 1609 n. 26. The courts that have considered notice issues have, however, followed the recommended procedures. See, e.g., In re N.A.H., 418 N.W.2d 310, 311 (S.D.1988) (better practice is to follow BIA guidelines); In re Colnar, 52 Wash.App. 37, 39, 757 P.2d 534, 536 (1988) (follows guidelines noting "caselaw is spotty"); In re H.D., 11 Kan.App.2d 531, 534, 729 P.2d 1234, 1238 (1986) (treats the Guidelines as establishing "pretrial requirements"); In re Junious M., 144 Cal.App.3d 786, 792 n. 7, 193 Cal.Rptr. 40, 43 n. 7 (1983) (Guidelines entitled to "great weight" as Department of Interior's interpretation of ICWA).
The cases that have resolved notice questions have followed the Guidelines in giving a broad reading to the obligation to give notice and redressing notice violations even where it is unclear that the child involved is an Indian child. The closest case to this one is In re H.D., a termination of parental rights case where the mother of the juvenile was 15/32 degree Indian blood of the Cherokee Tribe but did not become an enrolled member of the tribe until six weeks after the severance of her parental rights. 11 Kan.App.2d at 532, 729 P.2d at 1236. The Kansas Court of Appeals held that the *634 mother's Indian blood gave the trial court notice that the children were of Indian descent and raised the requirement for notice under 25 U.S.C. § 1912(a) as interpreted in the Guidelines. 11 Kan.App.2d at 537-38, 729 P.2d at 1239. In reaching this conclusion, it noted that enrollment is not always required for tribal membership so the absence of enrollment alone was not determinative that the mother was not a member of the Cherokee Tribe. Id. at 535, 729 P.2d at 1238.
In In re Junious M., the evidence before the trial court was that the child's mother was a member of a Canadian Indian tribe. 144 Cal.App.3d at 791, 193 Cal.Rptr. at 42. However, before the decision, counsel for the mother informed the court that the tribe existed in the United States. The trial court held the child was not an Indian child, but the California Court of Appeals reversed, after reviewing the membership rules of the American tribe and concluding there was an "ambiguity" bearing on whether the mother was a member of the tribe. Id. at 793-94, 193 Cal.Rptr. at 44. The court held that notice to the tribe was required because the question of whether the child was an "Indian child was for the tribe to determine" and the tribe had been deprived of the right to make that determination. Id. at 792, 193 Cal.Rptr. at 43.
Finally, in In re Colnar, the mother alleged that she was one-quarter Apache Indian and that made the child an Indian child. 52 Wash.App. at 38, 757 P.2d at 535. The Washington Court of Appeals held that this claim was sufficient to require the trial court to notify the Apache Tribe, even though the applicable state agency filed an affidavit indicating that an investigation involving discussions with representatives of the tribe showed that the child was not eligible for membership. Id. at 41, 757 P.2d at 536. The court stressed that the tribe had the authority to determine its own membership and is entitled to notice for that purpose. Id. at 39, 757 P.2d at 535.
Although this is a closer case than H.D., Colnar or Junious M., we believe that the statute as interpreted in the Guidelines requires that the trial court give notice to the Saint Regis Mohawk Indian Tribe. The father's membership in this tribe alone gives the trial court reason to know that the juvenile could be a member of the tribe and thus be an Indian child. Cf. Trentadue & DeMontigny, The Indian Child Welfare Act of 1978: A Practitioner's Perspective, 62 N.D.L.Rev. 487, 505 (1986) (some tribes "extend membership to any descendent of a member regardless of Indian blood quantum"). Although the father testified that the juvenile was eligible for membership, but not a member, we cannot find that evidence to be conclusive. The tribe, not the father, is the arbiter of its membership and as the commentary to the guidelines states is the best source of information on whether the juvenile is a member. The father is not necessarily knowledgeable about tribal membership, and his interests may diverge from those of the tribe. We find the father's evidence to be similar to the state affidavit in Colnar. It is a secondary source of information that cannot substitute for notice to the tribe.
We agree with SRS that the trial court ruled correctly with respect to the Micmac Indian Tribe. The Act requires that the tribe be eligible for services provided to Indians by the Secretary of the Interior. The Micmac Indians are not on the list of tribes eligible to receive these services. See footnote 3, supra. There is no real dispute between the parties that they are an unrecognized tribe. Nothing would be gained by notifying them. They have no special information for the court nor do they have an interest protected by the ICWA.
In reaching the conclusion that the court erred in not requiring notice to the Mohawk Indian Tribe, we are mindful that the "ICWA is primarily a jurisdictional statute." In re N.A.H., 418 N.W.2d at 311. Thus, the ICWA specifically provides for collateral attack on juvenile placements as a result of violations of the notice requirement of § 1912(a) and other requirements of the Act. 25 U.S.C. § 1914. See In re Angus, 60 Or.App. 546, 655 P.2d 208 (1982). To maintain stability in placements of children *635 in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly whether the juvenile is an Indian child. See Hollinger, Beyond the Best Interests of the Tribe: The Indian Child Welfare Act and the Adoption of Indian Children, 66 U.Det.L.Rev. 451, 476-77 (1989).
The parents argue that the failure to give notice must result in the reversal of the CHINS adjudication and the return of the juvenile to their custody. We do not believe such a remedy is warranted where the sole deficiency at this time is in notice and there has been no determination that the ICWA otherwise applies to this proceeding. Thus, in In re Colnar, 52 Wash. App. at 41, 757 P.2d at 536-37, the court remanded the matter to the trial court to notify the appropriate tribe, and, when the tribe did not intervene in the proceeding, affirmed the original order. The court in In re Junious M., 144 Cal.App.3d at 798-99, 193 Cal.Rptr. at 47, ordered a similar remand for notice. We concur that these cases set forth the appropriate procedure and remand to the trial court for notice according to the Act. If the tribe does not seek to intervene, or after intervention the trial court still concludes that the ICWA does not apply, the original orders will stand. If the trial court does conclude that the ICWA applies, further proceedings consistent with the Act will be necessary.[5]

III.
Because we do not know the effect of the remand to give notice to the Mohawk Indian Tribe, we must reach the other issues raised by the parents. The parents' next argument is that the trial court failed to issue timely merits findings before the disposition hearing as required by 33 V.S.A. § 654. Further, the parents argue that this error cannot be cured by the issuance of such findings at a later date and therefore that the disposition order should be reversed. We disagree, and find that any initial error was cured.
The merits hearing in this case was held on December 15-17, 1986, and on December 30, 1986, the court issued its findings and order. For its findings of fact, the court adopted the facts "as set forth in the petition and affidavit." The petition filed by SRS contained no factual allegations. The affidavit submitted by a state police officer related statements by the juvenile and the neighbor to whose home the juvenile fled. The juvenile's statements alleged that her mother "beats her almost daily" and required her to do most of the house chores and that her father forced her to have sexual intercourse with him "quite frequently every week." The neighbor's statement alleged that the mother physically abused the juvenile and the father sexually abused her and that the juvenile was not properly fed or cared for. The court ordered that the juvenile remain in SRS custody and scheduled a disposition hearing for January 15, 1987. SRS filed a disposition report on January 12, 1987, and the disposition hearing was held on January 19, 1987. In its disposition order, the court transferred legal custody of the juvenile to SRS with residual parental rights and responsibilities remaining with the parents. The disposition order was issued with no written findings.
The parents filed the notice of appeal to this Court on January 28, 1987. However, on April 22, 1987, the parties stipulated to remand to the trial court for taking additional evidence regarding "whether the juvenile is a child in need of care and supervision." The stipulation went on to state that if, after the additional evidence was taken, the juvenile was not found to be a CHINS, the appeal would be dismissed. Alternatively, it stated that if the juvenile was found to be a CHINS, the appeal would continue. A hearing was held before the same trial judge on April 28 and 29, 1987, and on June 18, 1987, the court issued written findings of fact, conclusions of law and its order. The findings and the *636 conclusions were based on both the December, 1986 and the April, 1987 hearings.
The parents first argue that 33 V.S.A. § 654(b) requires that merits findings must precede a disposition hearing, that there were no valid merits findings in this case and that, therefore, the CHINS adjudication must be reversed. We concur on the first two points of the argument but find that the error was cured. We require that both merits and disposition orders be accompanied by findings of fact which are sufficient to support the court's conclusion that the child is in need of care or supervision or its disposition order. See 33 V.S.A. § 654(a) (merits hearing); In re M.B., 147 Vt. 41, 44-45, 509 A.2d 1014, 1017 (1986) (disposition); In re J.M., 131 Vt. 604, 608, 313 A.2d 30, 32 (1973) (merits).[6] The merits findings must be issued within a reasonable time. See In re B.M.L., 137 Vt. 396, 399-400, 406 A.2d 383, 385 (1979). When the juvenile court issues such an order without findings, we remand the case back to the court for findings or, if too much time has passed since the original evidentiary hearing, for a new hearing from which written findings can be made. For example, in In re R.H., 138 Vt. 425, 415 A.2d 1318 (1980), the district court concluded that the child in question was a child in need of care or supervision but failed to issue any factual findings supporting the conclusion. Id. at 426, 415 A.2d at 1319. We stated that "[w]ithout adequate findings this Court cannot determine if the facts support the judgment in the particulars alleged in the petition." Id. at 427, 415 A.2d at 1320. We reversed the merits and disposition order and remanded the case to the district court for a new merits hearing.
In the instant case, the court did little more than recite the statutory grounds for finding a child to be in need of care or supervision. The only factual findings that accompanied this conclusion were adopted by reference to the police officer's affidavit. The affidavit, in turn, contained only a recitation of what the juvenile told the officer, with no independent verification or statement of what the officer found. The court's findings, if they can be fairly characterized as findings, are not sufficient to support the court's conclusion that adjudged M.C.P. a CHINS. Therefore, the December 30, 1986, merits order was not sustainable. If there were no later action, we would grant the relief requested in view of the time that has intervened.
Following a stipulation by the parties for taking additional evidence, the district court held a new hearing on April 28-29, 1987, after which it issued written findings of fact and concluded that the juvenile was a CHINS. The June 19, 1987 findings are adequate for this Court to review. The new hearing, and the findings, are the remedies most favorable to the parents that this Court could have ordered if we had reviewed the case before the findings were made.[7] See id. at 427, 415 A.2d at 1320; In re R.B., 134 Vt. 368, 370, 360 A.2d 77, 78 (1976). Thus, the parties have already agreed to and implemented a proper remedy. No further relief can be granted.
The original disposition order of January 19, 1987, suffered the same defects as the original merits order. Like a merits order, a disposition order must be accompanied with findings of fact that are sufficient to support the court's conclusions and that can be reviewed by this Court. See, e.g., In re J.R., 147 Vt. 34, 36, 509 A.2d 1012, 1014 (1986). "It is crucial that findings indicate to the parties and to this Court, if an appeal is taken, what was decided and how the decision was reached." In re M.B., 147 Vt. at 45, 509 A.2d at 1017.
No findings were made in connection with the original disposition order. However, *637 in December of 1987, the parents moved for SRS to be found in contempt of the disposition order for failure to allow the parents visitation of the juvenile. The parties agreed to hear that motion in connection with a new evidentiary hearing on disposition to allow for dispositional findings. The hearing occurred in February of 1988 and resulted in findings on April 11, 1988. Based on the findings, the court continued custody with SRS and restricted visitation to instances where the juvenile consented.
There were two errors in the January 19 disposition order. It lacked findings and was issued before the valid June 19, 1987, merits decision was rendered. The disposition of the child can be decided only after the child is adjudged to be a CHINS. 33 V.S.A. § 654(b). For these reasons, the January 19 disposition order was defective, and we would reverse it if it were still effective.
As with the merits order, we find that the error was corrected. As we recently held in In re R.M., the consequence of the lack of findings to support a disposition order, at least where too much time has intervened to allow findings on the original evidence, is "`a new disposition hearing in order to determine the current circumstances of the parties.'" 150 Vt. 59, 72, 549 A.2d 1050, 1058 (1988) (quoting In re M.B., 147 Vt. at 45, 509 A.2d at 1017). By agreement of the parties, a new disposition hearing was held and detailed findings were issued leading to a disposition order that continued SRS custody. Thus, the remedy most favorable to the parents has occurred and there is no further error to correct.

IV.
As their third argument, the parents turn their claims about the lack of findings into an attack on the timeliness of the valid merits and disposition adjudications. We concur with the parents that the juvenile statutes show a "dominant concern on the part of the legislature ... for speedy resolution of disputes." In re R.S., 143 Vt. 565, 569, 469 A.2d 751, 754 (1983). See also In re J.E.G., 144 Vt. 309, 315, 476 A.2d 130, 134 (1984) (reiterates the "`important policies supporting the speedy resolution of juvenile proceedings'" (quoting In re R.S.)). If we consider that the valid hearings in this case were those that resulted in findings, neither the merits hearing nor the disposition hearing were held within the time frames specified by the statute. See 33 V.S.A. § 647(a) (hearing shall be held not later than fifteen days after the petition is filed alleging that a child is in need of care or supervision if the child is placed in detention); 33 V.S.A. § 654(b) (disposition hearing is to be held not more than thirty days after the merits findings). We have recently held, however, that the time schedules presented in the statute are directory and not jurisdictional. In re J.R., ___ Vt. ___, ___, 570 A.2d 154, 157 (1989). Thus, noncompliance with the directory time limits "does not result in voiding either the disposition order or the CHINS adjudication." Id. at ___, 570 A.2d at 158. We have also recently narrowed our prior precedent, In re B.M.L., 137 Vt. 396, 406 A.2d 383, holding that the automatic remedy for failure to issue a merits order within a reasonable time was return of the child to the parents through habeas corpus. Id. at 400, 406 A.2d at 385. In In re A.S., 152 Vt. ___, ___, 567 A.2d 1139, 1142 (1989), we held such relief could be granted only if the court found that it would be in the best interest of the child.
These decisions reflect that the parents' rights to speedy adjudication must be weighed with the child's best interests. See In re R.B., 152 Vt. ___, ___, 566 A.2d 1310, 1313 (1989). They further reflect that remedies in juvenile cases must protect the interest of the child and dismissal of a CHINS case rarely protects that interest. Id. at ___, 566 A.2d at 1314.
For a number of reasons, it would be inappropriate to provide the parents any further relief for delays in this case. First, while the delays came in final merits and disposition adjudications, the real delay was in the issuance of findings. As discussed above, the proper remedy for lack of findings is a new hearing with proper findings. These remedies have occurred. *638 Adding further remedies for the parents would elevate their rights above the interests of the juvenile. Id.
Second, the exact remedies used here would have been ordered if we had reviewed the case without the voluntary correction, and the delays would have been similar. Since appeal delays could not have resulted in dismissal of the CHINS case, we cannot see how delays caused when the parties voluntarily correct the errors should have that result.
Finally, the parents have not shown any prejudice from the delays. There is no indication that they sought findings or further hearings when findings were not issued. The findings that were finally issued were consistent with the initial decisions on the merits and on disposition; the conclusions based on these findings were essentially the same.
In holding that the parents are not entitled to additional relief for delay, we do not intend to endorse the procedures used in this case. The need to rehear some of the merits evidence and all of the disposition evidence was a great waste of judicial resources in an area where these resources are already stretched thin. There was a great risk of inconsistent adjudication with resulting serious harm to the juvenile. These cases are far too important to be disposed of in a hasty and incomplete fashion.

V.
The parents' next argument is that the findings of fact issued by the trial court on June 18, 1987 in the CHINS determination are not supported by the evidence and are so flawed as to be clearly erroneous. We conclude that the trial court's findings of fact are supported by the record.
The challenged findings are the result of both the first and second merits hearings. Although the standard of proof for a CHINS adjudication is that the findings be supported by a preponderance of the evidence, see, e.g., In re M.B., 147 Vt. at 44, 509 A.2d at 1016, the juvenile court concluded that the State proved that the juvenile was a CHINS by the higher standard of clear and convincing evidence. We have recently reaffirmed that the "trial court's findings must stand unless clearly erroneous." In re J.R., ___ Vt. at ___, 570 A.2d at 158; see also In re C.L., 151 Vt. 480, 491, 563 A.2d 241, 249 (1989). The court's conclusions of law must also be affirmed if they are supported by the findings.
The court set out ten pages of findings and conclusions. The parents point to six specific findings that they claim are unsupported. In addition to the specific findings, the parents also challenge the trial court's reliance on the juvenile's testimony "despite its inherent reliability and inconsistencies." Upon reviewing the transcripts, we agree that a great deal of contradictory evidence was introduced. Nevertheless, it is the function of the trial court to weigh the evidence. Our role is limited to reviewing the findings to determine whether they are supported by the record.
First, the parents argue that the court erroneously found that: "M.C.P. told the neighbor of being beaten with a leather belt and sticks by the mother and being choked by her. She also related that the father had forced sexual intercourse upon her on a regular basis." Although it is not clear from the evidence that the juvenile related all of this information to the neighbor, each of these allegations against the parents is supported in the record. The neighbor testified that the juvenile told her that she had been beaten and choked by her mother, and that her father did "nasty things" to her that included undressing the two of them. The juvenile testified that her mother beat her with a leather belt and sticks and that her father had sexual intercourse with her on a regular basis. To the extent there is an error in the court's finding, it is harmless.
Second, the parents challenge the court's finding that: "The most recent beatings arose from the child's failure to perform her math homework properly. The child has some learning disabilities which caused complications with some subjects. The parents, although aware of the diagnosis, *639 chose to ignore it and assess the problems to the child's laziness." The only material portion of these findings necessary to adjudge the juvenile a CHINS is that she was beaten. She testified that she was beaten after she had problems with her division math homework the day she ran away. That testimony supports the finding.
The third finding at issue is that: "The doctor noted a variety of bruise marks about the throat, wrist, shoulder area, and buttocks. These marks confirm the child's story of beatings and chokings." The doctor, a pediatrician who examined the juvenile in the emergency room shortly after the police had taken the juvenile into protective custody, testified that the juvenile complained of pain in her right wrist and the front of the neck, over her left shoulder and over her buttocks. During the medical examination, the doctor noted several fresh marks on the juvenile including three bruises on the shoulder, a reddening of the skin over the buttocks, pain in the right wrist, and a mark on her neck consistent with having been choked. The doctor further stated that these marks could have been caused by the juvenile's fall when she jumped out of the window, but that it was more likely that they were caused by abuse. This finding is adequately supported.
Fourth, the court found that: "The child informed the mother in the past about the incidents which the mother accepted as true. Rather than protect the child, she began abusing the child and calling the child her husband's wife. The mother became jealous of the child." Although the juvenile's testimony was not consistent with regard to the time and place of these events, her testimony supports each of these statements. The doctor testified that while it is not unusual for children to have problems with the time frame of events, they can still be quite clear about the event itself.
The fifth and sixth challenges are similar. The court found that: "The child states that the father has had sexual intercourse with her for a period of eight years at a frequency of at least once a week. She does graphically describe the latest incident of sexual actions some few days prior to ... running away from the home." The court also found that: "The doctor finds from the exam that the child's story of repeated sexual contact with the father, can be supported by her examination." Both the juvenile's and the doctor's testimony fully supports these findings. The physician testified that the pelvic examination revealed that the vagina was quite dilated and distended, which is unusual for a twelve year old girl, and that the condition was entirely compatible with frequent intercourse. The doctor further testified that while it is not impossible for this condition to be self-inflicted, it would be very unusual. The doctor also testified that the juvenile's knowledge of sexual intercourse was more detailed than most twelve-year-olds'.
We recognize that the trial judge had a difficult responsibility to make findings where the facts were sharply contested and the juvenile's accounts were not entirely consistent. The father argues that the trial court could not have chosen to believe the child's allegations over his denial in view of the inconsistencies or, in any event, had a duty to specify why he chose to believe the child. Neither argument finds support in our law. The trial court viewed the witnesses and could choose which testimony to believe. It need not explain the choice.
We conclude that the material findings by the trial court are supported by the evidence. We also find that these findings adequately support the CHINS adjudication.

VI.
The parents' final argument is that the April 11, 1988, disposition order must be vacated because it requires them to admit that they abused the juvenile in order to regain custody, and this requirement violated their Fifth Amendment right against self-incrimination. The trial court found that: "The father ... denies any physical or sexual abuse by himself or his wife, and feels that the lack of visits is *640 tearing his whole family apart." The court also found that: "The prospects for a reunification of the family, which is the intent of [SRS], are not good and will remain unsatisfactory so long as the denial of the abuse continues and the unwillingness to address this aspect of the matter in counseling continues." As a result of these findings, the court concluded that "[u]ntil the parents get over the extreme denial of any abuse and seek counseling to overcome these problems, custody will continue with the Commissioner of [SRS]."
Juvenile custody cases in Vermont are civil and not criminal proceedings. Nevertheless, the privilege against self-incrimination applies in civil as well as criminal litigation. Milne v. Shell Oil Co., 129 Vt. 375, 377, 278 A.2d 741, 742 (1971). The State cannot compel an individual to testify against himself or herself at least without an appropriate grant of immunity in any subsequent criminal prosecution. See, e.g. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Additionally, the State may not impose a penalty or sanctions against an individual for invoking the privilege. See, e.g., Minnesota v. Murphy, 465 U.S. 420, 434, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409 (1984); Lefkowitz v. Cunningham, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). In Lefkowitz v. Cunningham, the Court emphasized that "the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids." 431 U.S. at 806, 97 S.Ct. at 2136. There is no question that deprivation of custody of a child is a sanction for purposes of the Fifth Amendment.
CHINS proceedings present a dilemma. The juvenile court has a strong interest in protecting the best interests of the child under its jurisdiction. It would be irresponsible for the court to return an abused child to the custody of abusive parents unless and until it can be assured that there will be no repetition of the abusive actions. This responsibility is particularly great in this case where the court has found the parents physically abused the child and the father has had regular sexual intercourse with the child over an extended period. At the same time, the child's parents may not be compelled to incriminate themselves in order to regain custody of their child. Certainly the misconduct found by the trial court could form the basis for criminal prosecution of one or both parents.
The dilemma was recently confronted by the Minnesota Supreme Court in In re J.W., 415 N.W.2d 879 (Minn.1987). In J.W., two children were taken from their parents' custody because a cousin died from a severe blow to the abdomen while in the parents' care. Id. at 880. In a subsequent investigation of the cousin's death, the parents invoked their privilege against self-incrimination. The juvenile court found the parents were responsible for the cousin's death and placed custody of the children with the state agency to protect them from possible physical abuse. The dispositional order set a number of requirements for the parents to regain custody of their children. Id. at 881. One requirement was that they obtain psychological evaluations in which they explain the death of the cousin consistent with the medical findings. The parents challenged this requirement as a violation of their self-incrimination privilege.
The Minnesota Court held in J.W. that the trial court order was invalid to the extent it required the parents to incriminate themselves to avoid termination of parental rights. The court went on to say, however:
But this is as far as the privilege extends protection. While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may require the parents to otherwise undergo treatment. Therapy, however, which does not include incriminating disclosures, may be ineffective; and ineffective therapy may hurt the parents' chances of regaining their children. These consequences lie outside the protective ambit of the Fifth Amendment.
Id. at 883. The opinion emphasized that the privilege cannot immunize the parents *641 from the consequences of their physical abuse of their children's cousin. Id. Thus, the parents had to show that their children could safely be returned to them. Their difficulty in discharging this burden without admitting their own inadequacies is a consequence of their actions, and the difficulty is not removed by the Fifth Amendment. Id. at 884.
The Minnesota Court revisited the issue in In re J.G.W., 433 N.W.2d 885, 885 (Minn. 1989), where a father was denied visitation with his children unless he admitted that he had sexually abused them. The court found that the specific requirement violated the father's self-incrimination privilege but added "that the privilege does not protect the parent from the consequences of any failure to succeed in a court-ordered treatment plan merits equal emphasis." Id. at 886.
We agree with the analysis of the Minnesota Supreme Court. The trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family. On the other hand, the parents must demonstrate to the court that it is in the juvenile's best interest to return custody to the parents in the face of the serious misconduct the court found they engaged in. While the court may not specify that the only route to reunification is an abandonment of the self-incrimination right, the parents must expect that the court and SRS will act based on the findings of extreme parental abuse. If the parents can find a way to show that they have become good parents, without admitting to any misconduct, and that a restoration of custody of the juvenile to them is in the best interest of the child and is safe, the court may not foreclose the option. If the court finds in the future, however, that the parents have made no progress to reunification because their denial prevents effective therapy, it may act on that finding to the parents' detriment without offending the Fifth Amendment privilege. As the Minnesota Court stated, this consequence of the parents' denial is not a penalty or sanction but is instead an expression "of the reality that it is unsafe for children to be with parents who are abusive and violent." In re J.W., 415 N.W.2d at 884.
The court's statement that custody will remain with SRS "[u]ntil the parents get over the extreme denial of any abuse and seek counseling to overcome these problems" may be read as a requirement that the parents waive their Fifth Amendment privilege. Accordingly, we strike all in the sentence except the conclusion: "Custody will continue with the Commissioner of Social & Rehabilitation Services." In doing so, we reiterate that the parents retain the burden to respond to the findings of severe physical and sexual abuse if they are to make any progress to reunification.

VII.
The final issues were raised on collateral appeal by the juvenile's brother, E.P., and concern SRS's investigation of allegations that the parents have also abused him. We find that the trial court did not have jurisdiction to issue the order it did and, therefore, strike the provision involved in this appeal.
The relevant facts are as follows. The brother visited the juvenile on several occasions when she was in the custody of SRS. After these visits, the juvenile reported to SRS officials that her father was sexually abusing her brother. SRS officials in turn questioned the brother about these allegations, and he denied that he was the victim of any abuse. The third and final time SRS questioned him was at his school, and the SRS worker was accompanied by two state troopers. Following this third incident, the brother obtained counsel who asked that SRS not question his client unless the attorney is present. Counsel asserted that the "interrogation of E.P. was a seizure that was unreasonable in scope and unjustified at inception." SRS responded that it would not permit a child's attorney to be present when questioning the child about sexual abuse.
After the trial court issued its disposition order in this case, the brother sought intervention for the limited purpose of contesting the requirement that the brother visit *642 with the juvenile. During the hearing on the motion, counsel for the brother brought up the questioning of the brother without the presence of counsel. The court indicated that it would also resolve this issue. On May 3, 1988, the court issued an order allowing the brother to intervene and appointing counsel for him. The court granted the brother's request on the visitation issue and ordered SRS not to contact or interview the brother "except through ... [E.P.'s] counsel ...; and except for the purpose of investigating child abuse complaints as required by 33 V.S.A. § 685." The brother appealed from this order challenging the last exception that SRS could interview him without counsel in order to investigate child abuse complaints. His brief raises six issues: (1) this Court has jurisdiction over this appeal; (2) the trial court should have exercised its contempt power to prevent SRS from interrogating him without the presence of counsel; (3) SRS's past and present proposed interrogations are violative of his constitutional right to be free from unreasonable seizures; (4) the trial court disregarded the express language of the statute in ruling that, as a matter of law, 33 V.S.A. § 685 requires SRS to interrogate him concerning child abuse complaints without the presence of his lawyer; (5) the trial court denied him due process by issuing an order in conflict with its oral ruling which induced him to forego the introduction of evidence; and (6) this appeal has not become moot. Because we find that the juvenile court lacked jurisdiction to hear the interrogation issue, we strike the order without reaching the merits of the appeal.
When the district court is acting as a juvenile court, it is exercising special and very limited statutory powers. See In re T.L.S., 139 Vt. 197, 199, 425 A.2d 96, 97 (1980). Generally, unless there is statutory authority for a particular procedure, the court does not have the power to employ it. Id. A juvenile court has exclusive jurisdiction "over all proceedings concerning any child who is ... a child in need of care or supervision brought under the authority of this chapter, except as otherwise provided in this chapter." 33 V.S.A. § 633(a). In focusing on the alleged or adjudicated CHINS child, the court brings before it certain parties. See 33 V.S.A. §§ 632(a)(13) (definition of party), 646(2), 647(a) (description of who is a party). While most parties are specified by statute, the court does have the power to add others who are "proper or necessary parties." 33 V.S.A. § 647(a). This concept is fleshed out in Civil Rules 16 and 17, which apply in CHINS proceedings. See In re J.R., 147 Vt. 7, 10, 508 A.2d 719, 721 (1986).
We need not consider in depth the power of the court to add parties, and consider issues related to them, to decide the issues in this case. E.P.'s complaint against SRS was only tangentially involved with this case. The sole connection was that SRS's past interviews of the brother had resulted from claims made by the sister. This is, however, a juvenile case concerning M.C.P. The court has no jurisdiction to consider side issues that do not concern the status of the juvenile. Thus, at least as to the interrogation question, the brother was not a proper or necessary party under § 647(a).
We believe that rigid adherence to the limits on the powers of the juvenile court expressed in the statute is necessary to ensure a single-minded focus on the juvenile before the court. In a case where both the merits and the disposition hearing had to be redone because the initial attempt was not completed with the care and consideration the statute requires, it is particularly ironic to find the resources of the juvenile court diluted to resolve a separate dispute that had no impact on the juvenile.
The case is remanded for notice to the Saint Regis Mohawk Tribe pursuant to 25 U.S.C. § 1912, and proceedings not inconsistent with this opinion. Except as specified below, the disposition order of April 11, 1988 shall remain in effect until further order of the juvenile court. If after notice, the juvenile court determines that the Indian Child Welfare Act does not apply to this case, the merits order of June 18, 1987 is affirmed and the disposition order of April 11, 1988 is affirmed *643 with the second sentence of the conclusions of law and order to read: "Custody will continue with the Commissioner of Social and Rehabilitation Services." The order of May 3, 1988 is stricken.
NOTES
[1] The Act contains a lengthy definition of "child custody proceeding" to include actions that place children in foster care, preadoptive placement, or adoptive placements and actions to terminate parental rights. 25 U.S.C. § 1903(1) (1982 & Supp. IV 1986). Generally, the Act applies to child custody proceedings although specific sections may describe in detail the proceedings to which they apply. See 25 U.S.C. § 1912(a) (1982 & Supp. IV 1986) (proceedings for "foster care placement of, or termination of parental rights to, an Indian child").

There is no question that this case became a child custody proceeding. There may be a question of when it became such a proceeding. A CHINS adjudication under 33 V.S.A. § 654 does not determine disposition, and, in many cases, will not result in foster care placement or termination of parental rights. The possible dispositions include placement with the parents, guardian or custodian under conditions and limitations and protective supervision. See 33 V.S.A. § 656(a)(1), (2).
[2] At the time of the trial court's action in this case, the most recent list was contained in 51 Fed.Reg. 25, 115-25, 118 (July 10, 1986). There is no relevant difference between the 1986 and 1988 lists.
[3] The Micmac Indian Tribe is not found in the Federal Register list. See 53 Fed.Reg. 52,829-52,835 (Dec. 29, 1988). On January 8, 1986, the Bureau of Indian Affairs filed a notice of receipt of "a petition for acknowledgement by the Secretary of Interior that the [Micmac Tribe] ... exists as an Indian Tribe." 51 Fed.Reg. 785 (Jan. 8, 1986). There is no indication of action on this petition.
[4] The Bureau of Indian Affairs in the Guidelines, discussed infra, takes the position that the determination of tribal membership by the tribe is conclusive. Guideline B.1(b)(i), 44 Fed.Reg. 67,586 (Nov. 26, 1979). There is some debate about the validity of this assertion, see Tellinghuisen, The Indian Child Welfare Act of 1978: A Practical Guide with [Limited] Commentary, 34 S.D.L.Rev. 660, 669 (1989), but we need not address it in this opinion.
[5] We do not take a position on whether, if the ICWA applies, the court will have to reconsider the CHINS adjudication. See footnote 1, supra.
[6] Because of the statutory requirement for findings, it is not necessary that a party request them under V.R.C.P. 52(a) in a CHINS merits adjudication. Findings are not required in the absence of a request when a party seeks an order for which the statute does not require findings. See In re J.R., 147 Vt. 7, 10, 508 A.2d 719, 721 (1986).
[7] In this case, the trial court relied in part upon evidence taken in December, 1986. Apparently, the parties agreed to this procedure, and they have not contested it here. It was acceptable, given the limited period between the December and April hearings.