693 A.2d 283 (1997)
In re J.T. and C.T.
No. 96-051.
Supreme Court of Vermont.
January 10, 1997.
*284 Charles S. Martin of Martin & Paolini, Barre, for appellant mother.
Michael Rose, St. Albans, for appellant father.
Jeffrey L. Amestoy, Attorney General, Montpelier, and Michael O. Duane, Assistant Attorney General, Waterbury, for appellee Department of Social and Rehabilitation Services.
Robert Appel, Defender General, and Henry Hinton, Appellate Defender, Montpelier, for appellees juveniles.
Before ALLEN, C.J., and GIBSON, DOOLEY, MORSE and JOHNSON, JJ.
GIBSON, Justice.
J.T.'s and C.T.'s mother and father separately appeal a family court order terminating their parental rights to both children. The mother argues that the court erred in terminating parental rights without a prior approved case plan and that the court improperly incorporated CHINS findings in the disposition findings. The father argues that the court failed to determine whether the Vermont Department of Social and Rehabilitation Services (SRS) made reasonable efforts to assist him. Both parents contend that the court should have provided notice under the Indian Child Welfare Act (ICWA) as soon as it had reason to believe that the *285 children were of Indian ancestry. We remand for the court to give notification of the proceeding to the Bureau of Indian Affairs. If a tribe responds, further proceedings consistent with the ICWA will be necessary; otherwise, we affirm the court's finding that it is in the best interests of J.T. and C.T. that parental rights be terminated.
SRS first became involved with the family in May 1989, when the parents' failure to maintain telephone service while C.T. suffered from a breathing disorder posed a serious medical threat. From that date through 1993, SRS became increasingly involved with the family. Between 1989 and early 1991, two attempts were made to improve the mother's and father's parenting skills through the Family Intensive Program and a parent education program. Both counselors terminated the programs when the mother's mental health issues made working on parenting skills impossible. The mother began participation in a mental health program in 1989, but dropped out in January 1990. From late 1992 to early 1993, the mother again entered counseling, both individually and with the children, but attempts to improve parenting skills were unsuccessful.
In spite of the services offered by SRS, the condition of the family deteriorated steadily. By 1993 SRS had substantiated physical and sexual abuse to both children by family members and persons living with family members. There was also extensive evidence of physical neglect and emotional abuse to both children, particularly J.T. The children were taken into temporary custody by SRS in September 1993, and after a merits hearing in November 1993, they were found to be children in need of care and supervision (CHINS) due to lack of proper parental care.
A case plan was developed by SRS in March 1994 and given to both parents. Although the case plan set a goal of family reunification, the parents were informed at a case plan review on March 31, 1994 that failure to follow the plan could result in a change in the goal. Following the CHINS order and distribution of the case plan, both parents continued to receive family services through SRS.
After completion of a family evaluation by an independent psychologist, a disposition hearing was scheduled for July 27, 1994. At the start of the hearing, the parents informed the court that they planned to separate. Deciding that the existing case plan, which called for reunification of the children with both parents, was not appropriate if the parents separated, the court discussed development of new case plans, ended the hearing, and issued an order maintaining custody of both children with SRS. When SRS was unable to confirm that the mother and father had separated as announced, alternative case plans were not developed. Instead, a new SRS case plan dated September 9, 1994 called for termination of parental rights.
In October 1994, SRS filed a petition to terminate parental rights; hearings began in December. Following eight days of hearings, the court terminated parental rights.

I.
Mother and father both raise several issues on appeal. The mother first argues that the trial court erred in finding a change in circumstances when there had been no previously approved case plan. But termination of parental rights can occur in one of two ways. Where there has been a prior disposition order and an approved case plan, the court must find a substantial change in material circumstances and that it is in the best interests of the child that all parental rights be terminated. In re M.M., 159 Vt. 517, 521, 621 A.2d 1276, 1279 (1993). Parental rights may also be terminated at the initial disposition hearing if the court finds it to be in the best interests of the child to do so. In re B.M., 165 Vt. ___, ___, 679 A.2d 891, 895 (1996); 33 V.S.A. § 5540. The first method is preferred, In re B.M., 165 Vt. at ___, 679 A.2d at 895, but the court's findings in either situation will be upheld unless clearly erroneous. See In re J.M., 160 Vt. 146, 149, 624 A.2d 362, 363-64 (1993).
Some confusion was created by the abbreviated July 27 hearing, which was originally intended to be a disposition hearing. Additional confusion was created when the trial court included a finding of substantial change in material circumstances in its January 1996 *286 termination order, stating it was unsure of the effect of the July 27 hearing. Nonetheless, it is clear that the July 27, 1994 hearing was not a disposition hearing, and therefore the court's finding of substantial change in material circumstances was unnecessary. No evidence was considered during the July 27 hearingon either the mother's and father's parenting abilities or the children's physical and emotional condition. Instead, discussion focused solely on the adequacy of the current case plan and the need for new case plans. Although labelled a disposition order, the order issued that same day simply maintained the status quo until the confusion created by the parents' announcement of change in marital status could be sorted out. During a hearing on visitation six weeks later, the parties discussed the effect of the July 27 hearing. All parties and the court agreed there had been no disposition hearing and that disposition was still before the court. Ultimately, the court's extensive findings detailing nearly five years of evidence of the parents' inability to care adequately for the children are sufficient to support the court's conclusion that it was in the best interests of the children to terminate parental rights. Because the court's finding of change in circumstances was unnecessary, we do not address the mother's argument that modification of a disposition order due to change in circumstances cannot be supported without a prior approved case plan.
Our prior decisions do not affect our decision here. We have previously held that a court cannot continue a disposition hearing to determine how the situation of a child or a parent will change over time. In re B.B., 159 Vt. 584, 588, 621 A.2d 1270, 1273 (1993); In re R.B., 152 Vt. 415, 422, 566 A.2d 1310, 1313-14 (1989), cert. denied by Appleby v. Young, 493 U.S. 1086, 110 S.Ct. 1151, 107 L.Ed.2d 1055 (1990); In re A.A., 134 Vt. 41, 43, 349 A.2d 230, 232 (1975). In all those cases, however, a full disposition hearing was held, see, e.g., In re B.B., 159 Vt. at 585, 621 A.2d at 1271 ("court took extensive evidence at the disposition hearing"), and the hearings were continued for other reasons: to allow the court to accept additional evidence on a parent's progress, id. at 586, 621 A.2d at 1271, or to facilitate settlement of a contested disposition, In re R.B., 152 Vt. at 422, 566 A.2d at 1313-14. Holding proceedings open to allow admission of evidence of a parent's improvement is impermissible, because it places a child "in a state of continuing limbo rather than creating a stable living arrangement, as the law requires." In re R.B., 152 Vt. at 422, 566 A.2d at 1314.
Such was not the situation here. The hearing was not continued to allow additional evidence of the parents' improvement. Rather, it was continued as a result of the parents' announcement of their separation. After discussion among the parties and the court, the July 27 hearing was terminated and rescheduled for a date when case plans more appropriate to the parents' marital situation would be available. The court was not required to hold a disposition hearing when all parties agreed they were not prepared to address what was in the children's best interests.
Nonetheless, the mother claims that terminating her parental rights without an approved case plan is reversible error because she was never given information on how she could get her children back. The court's findings of fact clearly refute this argument. SRS developed a case plan for the parents on March 14, 1994, which it reviewed with them on March 31, 1994.
Both parents' participation in the programs outlined in the plan belies the mother's allegation that she could not meet "expectations that were never announced." Noting the specific programs offered to both parents, including individual counseling and the Nurturing Program for the mother, and parent education, supervised visitation, and other casework services for both parents, the court made detailed findings on the parents' participation in these programs and the lack of improvement in each. Both parents were told that supervised visits were an opportunity to demonstrate improved parenting skills. Nevertheless, the mother continued to act inappropriately and to fly into rages during visits, while the father did nothing to curb the mother's behavior. The evidence supports the court's finding that the March 1994 case plan gave the parents full opportunity to *287 develop and demonstrate improved parenting skills, and that it was in the children's best interests to terminate parental rights when the parents failed to make improvement.
Next, the mother argues that the court erred in adopting findings from the CHINS proceeding in the termination order because of the differences in burdens of proof. While the State's burden in a CHINS merits hearing is proof by a preponderance of the evidence, this burden rises to clear and convincing evidence in a proceeding to terminate parental rights. In re J.R., 164 Vt. 267, 270, 668 A.2d 670, 673 (1995).
In the termination order, the court first analyzed the facts under each of the 33 V.S.A. § 5540 factors and found, by clear and convincing evidence, that it was in the best interests of the children to terminate parental rights. In addition, the court incorporated certain findings from the CHINS proceeding. Although the CHINS court was required to determine by only a preponderance of the evidence that the children were in need of care and supervision, the court found by the higher standard of clear and convincing evidence that J.T. was without the proper parental care necessary for her physical and emotional well-being and that C.T. was without the proper parental care necessary for her physical well-being. The argument that the trial court could not incorporate findings based on clear and convincing evidence from the CHINS proceeding is without merit.
The father argues that the court erred in failing to make specific findings concerning whether SRS made reasonable efforts to assist him. Under 33 V.S.A. § 5540, the court is required to make specific findings on four statutory considerations. Whether SRS made reasonable efforts to assist the parents is not one of them, however; therefore, specific findings are not required. Cf. In re K.H., 154 Vt. 540, 541-43, 580 A.2d 48, 49 (1990), cert. denied by D.H. v. Vermont Dep't of Social & Rehabilitation Servs., 498 U.S. 1070, 111 S.Ct. 791, 112 L.Ed.2d 853 (1991) (court not required to make findings concerning SRS's reasonable efforts to return child to home under Adoption Assistance and Child Welfare Act).
Any assistance SRS provides to troubled parents is, however, a factor in determining whether SRS met its burden of showing that a parent is unlikely to be able to resume parental duties within a reasonable period of time. 33 V.S.A. § 5540(3); see In re H.S., 161 Vt. 83, 87, 632 A.2d 1106, 1108 (1993) (SRS's intensive work with mother showed reasonable efforts to assist her attempt to resume parental duties). Here, the court's findings on the services offered to the father and his lack of benefit from the programs support its conclusion that the father failed to recognize and address deficiencies in his own parenting skills, and that, even if he remained separated from the mother, he would be unable to resume parenting within a reasonable period of time. Although the father attended marriage counseling with the mother beginning in February 1994, the counselor concluded that the mother's intimidation prevented the father from contributing to a stable home. Supervised visits with the children were an opportunity for both parents to show improved parenting skills, but the father "did nothing to curb the rage or reign in the erratic behaviors" of the mother. The court found that SRS attempted to provide additional services to the father, but that he made no effort to revise his work schedule to enable participation. The father has failed to show these findings to be clearly erroneous.

II.
Both parents argue that the court erred in failing to provide notice under the Indian Child Welfare Act once the court had reason to believe that children of Indian ancestry were involved in the proceeding. We agree, and remand to the trial court for notice as required by the Act.
The Indian Child Welfare Act (ICWA) of 1978 was enacted to protect the interests of Indian children and promote the stability and security of Indian families and tribes. 25 U.S.C. § 1902 (1988 & Supp. II 1990); In re M.C.P., 153 Vt. 275, 282, 571 A.2d 627, 631 (1989). The father correctly notes that the Act is jurisdictional, In re M.C.P., 153 Vt. at 289, 571 A.2d at 634; In re *288 N.A.H., 418 N.W.2d 310, 311 (S.D.1988), and therefore, its applicability may be raised by any party or by the court itself at any time. See Woodard v. Porter Hosp., Inc., 125 Vt. 264, 266, 214 A.2d 67, 70 (1965). Despite the dissent's lament that the ICWA was not adequately raised before the trial court, even when a jurisdictional issue is never raised by a party we must take action on our own motion, if necessary, when a defect appears. See Murphy Motor Sales, Inc. v. First Nat'l Bank of St. Johnsbury, 121 Vt. 404, 406, 159 A.2d 94, 96 (1960) ("[W]hen such fact [lack of jurisdiction] appears we do not wait for parties to object, but this Court must act of its own motion.").
The ICWA requires that:
[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the ... termination of parental rights to [] an Indian child shall notify the parent or Indian custodian and the Indian child's tribe ... of the pending proceedings and of their right of intervention. If the identity or location of the ... tribe cannot be determined, such notice shall be given to the Secretary....
25 U.S.C. § 1912(a). The statute defines Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Id. § 1903(4). Although the ICWA states it is the duty of the party seeking termination of parental rights to give notice, we have found that this duty also extends to the court. See In re M.C.P., 153 Vt. at 288, 571 A.2d at 634 (ICWA requires that trial court give notice to tribe); see also In re D.S., 577 N.E.2d 572, 575 (Ind.1991) (remanded for trial court to serve notice to tribe).
Although the applicability of the ICWA was not raised at the trial level, the possible Indian ancestry of the children was brought to the attention of the trial court. When the mother, father, and children underwent a family evaluation upon referral by SRS, the father told a psychologist that his father was a "full-blooded Mohican." The psychologist included the statement in her report to SRS. Although the statement appears in the middle of a sixty-page report, the report figured prominently in SRS's decision to seek termination of parental rights, was admitted into evidence during disposition hearings, and was referred to in the court's findings of fact. Neither the agency nor the court can claim unawareness of information found in a report ordered and relied upon for disposition.
We conclude that the trial court had a duty to provide notice once it had reason to believe the children were of Indian ancestry. The Bureau of Indian Affairs (BIA) of the Department of Interior has issued "Guidelines for State Courts; Indian Child Custody Proceedings," outlining situations where a court should know that the child involved is an Indian child, thus requiring the court to notify the tribe. See In re M.C.P., 153 Vt. at 286, 288, 571 A.2d at 633, 634. One situation is where "[a]ny public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child." 44 Fed.Reg. 67,584, 67,586 (1979) (emphasis added). Such information serves to trigger inquiry by the court and the parties to determine whether the child is an Indian. Id.
In any event, even if the issue was not clearly in front of the trial court, it has certainly been presented for our consideration by all of the parties to the appeal. The most obvious circumstance that serves to trigger potential application of the ICWA is where "[a]ny party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child." 44 Fed.Reg. 67,584, 67,586. Both the mother and the father have informed this Court of their belief that the children are Indian children based on the father's understanding that his father was a full-blooded Native American. Inasmuch as this is a jurisdictional issue that can be raised at any time before this Court and an issue that requires action elsewhere before it can be resolved, we must remand in order that the matter be referred to the proper authority.
*289 SRS argues, however, that the parents have the burden of showing that the ICWA applies and that they failed to meet that burden. We disagree. As stated in In re M.C.P., the tribes are in a better position than the parents, the agency, or the court to determine potential membership, and the court should defer to that expertise. 153 Vt. at 285-86, 571 A.2d at 633. In fact, the BIA declined to define "member of a tribe" when promulgating regulations to implement the ICWA, noting that the term is defined by tribal law or tribal custom. 44 Fed.Reg. 45,096, 45,100 (1979). It is impossible for a tribe to determine whether a child is a tribal member or eligible for membership if it never receives notice of the proceeding. Only after notice has been provided and a tribe has failed to respond or has intervened but is unable to determine the child's eligibility for membership does the burden shift to the parties to show that the ICWA still applies. See In re A.G.-G., 899 P.2d 319, 322 (Colo.Ct. App.1995) (after no tribe responded to notice given to BIA, party asserting applicability has burden to show child is "Indian child" under ICWA); In re J.L.M., 234 Neb. 381, 451 N.W.2d 377, 385, 387 (1990) (after tribe concluded children not eligible for membership, party seeking to invoke ICWA has burden to show Act applies).
SRS does raise a valid concern regarding the difficulty created when the only information provided is the father's vague statement that his father was "full-blooded Mohican." The ICWA applies only to Indian tribes or nations that are recognized as eligible for services provided by the BIA. 25 U.S.C. § 1903(8). Here, the father asserts that "Mohican" is the same as Mohegan, a tribe recognized by the BIA for purposes of the ICWA. 60 Fed.Reg. 9250, 9252 (1995). In fact, authorities split over whether Mohican is an alternate spelling of Mohegan, a tribe to which the ICWA applies, or Mahican, a tribe not recognized by the BIA and therefore not under ICWA jurisdiction. Compare C. Waldman, Encyclopedia of Native American Tribes 142 (1988) (Mohegan: "a famous tribe ... because of the novel The Last of the Mohicans") with 18 Encyclopedia Americana 118 (1989) (Mahican: "They are the tribe about whom James Fenimore Cooper wrote The Last of the Mohicans.").
Fortunately the courts are not required to become experts in tribal genealogy. "If the identity or location of the Indian parents ... or the child's tribe cannot be determined, notice of the pendency of any involuntary child custody proceeding ... in a state court shall be sent ... to the appropriate [BIA] Area Director...." 25 C.F.R. § 23.11(b) (1996) (emphasis added). The regulations provide specific guidance on where notice should be sent for proceedings in Vermont, id. § 23.11(c)(1), and what information should be included in the notice, id. § 23.11(d). Upon receipt of notice, the BIA must make "reasonable documented efforts" to locate and notify the tribe of the proceeding within fifteen days. Id. § 23.11(f). The court erred in failing to provide such notice to the BIA.
The mother argues the court's failure to provide notice under the ICWA requires reversal of the termination order. We disagree. Such a remedy is not warranted where the only error is failure to provide notice and there is no strong showing that the ICWA applies. In re M.C.P., 153 Vt. at 289, 571 A.2d at 635. Therefore, the case is remanded to the trial court for notice to be given to the BIA. If no tribe is located, or a tribe is located but fails to respond, or the appropriate tribe determines that the children are not eligible for tribal membership, the original order will stand. If a recognized tribe does conclude that the children meet the ICWA definition, further proceedings consistent with the requirements of the ICWA will be necessary.
Remanded to the family court for notice to be given to the Bureau of Indian Affairs in accordance with the Indian Child Welfare Act and for proceedings not inconsistent with this opinion. If no tribe seeks to intervene or if, after intervention, the ICWA is found to not apply, the order terminating parental rights to J.T. and C.T. is affirmed. If a tribe does respond and determines that the children qualify as Indian children under the ICWA, then the termination order and the merits (CHINS) order are vacated, and further proceedings consistent with the Act will be necessary.
*290 MORSE, Justice, dissenting.
I concur in the affirmance, but I dissent that it be conditional on giving notice to the Bureau of Indian Affairs.
The sole basis for this Court to conclude that such notice is required under the Indian Child Welfare Act (Act) is a passing observation in a clinical psychologist's report (referred to in the trial record as the "Cone report") that father told the clinician he was the son of a "full-blooded Mohican." While the Court acknowledges that this brief reference appears in the middle of a sixty-page psychiatric evaluation of the family in question, this does not adequately place the matter in context. Department of Social and Rehabilitation Services (SRS) involvement with this family began in 1989. During the six-year period preceding the parental termination action, both parents underwent extensive and continual evaluations and counseling, generating numerous disposition reports, case plans, and psychological assessments. Many of these were introduced into evidence. As the trial court observed, the parents "have been exposed to just about every type of parental development program reasonably available in the area.... Therefore, the record contains detailed chronicles of the efforts of the [parents] ... to improve parenting and other skills." Yet, with the sole exception of the statement in the Cone report referred to above, nothingnot a single word or referenceappears anywhere in the trial exhibits or testimony concerning anything even remotely related to Native Americans. No witness testifying under oath, no affidavit by any interested party, no attorney, no social worker familiar with the family, made even the slightest allusion to a possible Indian connection, much less to the possibility that an Indian child was involved in the matter.
All that appears in the record is a hearsay statement by the father in the report of a psychologist who had no previous counseling experience with the family, and thus no basis whatsoever to evaluate the statement's credibility. Despite her unfamiliarity with the case, however, the psychologist observed substantial "discrepancies between [father's] accounts and those of others." She noted, for example, that "his description of his childhood given to this evaluator was markedly different from what he reported" to another clinician. "Thus," she concluded, "[father] may not be an entirely reliable informant."
This, then, is the sole evidentiary basis of the Court's holding: an isolated hearsay statement made to a single clinician unfamiliar with the family but sufficiently aware of discrepancies in father's account of his childhood to warn that he "may not be an entirely reliable informant," a statement that finds not even a whisper of corroboration in other evaluations by social workers who had worked with the family during its six years of involvement with SRS, a statement utterly ignored by trial counsel, and unconfirmed by the one person in the best position to know its reliabilitythe declarant. This is the evidence, in the Court's considered judgment, that should have provided the trial court with "reason to know that an Indian child [was] involved" and thus trigger the federal law's notice requirement. 25 U.S.C. § 1912(a) (1988 & Supp. II 1990). And this is the basis, finally, for the Court's conclusion that the order terminating parental rightsan order supported by overwhelming evidence of physical and sexual abuse of the minor childrenmust be indefinitely delayed, along with all hope of a favorable adoption, while the matter wends its way through the federal bureaucracy.[*]
To credit an argument of such obvious insignificance, particularly when it was never *291 raised below notwithstanding the fact that father was an active litigant, defies reason. If there were any possibility of truth to the reference, surely father or his attorney would have referred to it at some stage of the litigation. And even if he and all of the lawyers in this case were unaware of the legal significance of a parent of Indian heritage, surely that factif it was a factwould have been mentioned somewhere else in the "detailed chronicles" of the parents' six-year involvement with SRS.
The real tragedy of today's decision is the open-ended delay to establishing a permanent and stable home for these abused children. The irony is that such delay is totally unnecessary. My research has not disclosed a single federal or state decision requiring notice under 25 U.S.C. § 1912(a) on the basis of evidence of a similar nature. The seminal Vermont decision applying the Act, In re M.C.P., 153 Vt. 275, 571 A.2d 627 (1989), observed, to be sure, that courts have accorded a "broad reading to the obligation to give notice ... even where it is unclear that the child involved is an Indian child." Id. at 287, 571 A.2d at 633. In that case, however, the trial court had been "informed on numerous occasions that both the juvenile and her adoptive parents [were] of Native American Indian origin." Id. at 284, 571 A.2d at 632. Furthermore, the juvenile's father himself had testified that he was a full blooded Mohawk Indian. Id. The facts here, as summarized above, could not be less similar. The cases on which M.C.P. relied are equally distinguishable. In re H.D., 11 Kan.App.2d 531, 729 P.2d 1234 (1986), was a termination-of-parental rights case in which the mother testified that she was 15/32 Indian blood of the Cherokee tribe. Id. at 1236. The Kansas court held that the undisputed evidence of the mother's heritage was sufficient proof of the children's Indian descent to raise the notice requirement of the Act. Id. at 1239. The facts were similar in In re Junious M., 144 Cal.App.3d 786, 193 Cal.Rptr. 40 (1983), where counsel for the mother raised the Act with the trial court, and the mother testified that she was a member of an Indian tribe. Id. at 42-43. Under the circumstances, the Court of Appeal held that notice to the tribe was required. Id. at 43-44. Finally, in In re Dependency of Colnar, 52 Wash.App. 37, 757 P.2d 534 (1988), the mother's attorney raised the issue with the trial court as to whether the Act should apply, and the mother testified that she was one-quarter Apache Indian. Id. at 535. The court held that this claim was sufficient to require the trial court to give notice to the Apache tribe, even though the applicable state agency had filed an affidavit stating that a state investigation showed the child to not be eligible for membership. Id.
As these and other cases demonstrate, the courts have accorded a broad but sensible interpretation of what constitutes "reasonable grounds," Colnar, 757 P.2d at 536, under § 1912(a) to "know [] or ha[ve] reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). Until today, none has ever applied the notice requirement absent some affirmative effort by the parties to invoke the Act. Even the very liberal nonbinding "Guidelines for State Courts; Indian Child Custom Proceedings," on which the Court places so much reliance, leave ample room for reasonable judgments. One of the circumstances listed in the Guidelines is where a child protection service "has discovered information which suggests that the child is an Indian child." 44 Fed.Reg. 67,584, 67,586 (1979). This is not, as the Court implies, a mandate for notice upon the mere mention of an Indian tribe somewhere in the record, no matter how ephemeral, and completely regardless of context. The dictionary defines "suggest" as "[t]o cause to be present to the mind as an object of thought, an idea to be acted upon ... to propose as an explanation or solution." 17 The Oxford English Dictionary 142 (2d ed.1989). This implies at least some substance to the proposition "suggested," some "idea to be acted upon." The isolated hearsay reference in the psychiatric report does not rise even to this level, much less to the level of a "reason to know that an Indian child [was] involved." 25 U.S.C. § 1912(a).
Plainly the notice issue was an obvious throwaway by appellate counsel in light of the record. Unfortunately, the Court has embraced it. It is a shame the Court does *292 not give equal credence to the trial court's comprehensive analysis, which noted the "fears of the children regarding the uncertainty of their future," and found that "[p]ermanency is an important consideration for these children and ... should not be delayed further." The Court has needlessly prolonged their ordeal.
I am authorized to say that Chief Justice Allen joins in this dissent.
NOTES
[*] The Act purports to place some time limits upon the process. It provides that the Bureau of Indian Affairs shall have fifteen days to give notice to the tribe, that no proceeding shall be held until at least ten days after receipt of such notice by the tribe, and that the tribe shall, upon request, be granted an additional twenty days to prepare for such proceeding. 25 U.S.C. § 1912(a). The federal rules, however, state that if the Bureau is unable to verify that the child meets the criteria of an Indian child as defined in 25 U.S.C. § 1903, or is unable to locate the Indian custodians, it shall so inform the court and "state how much more time ... will be needed." 25 C.F.R. § 23.11(f) (1996). Given the total uncertainty surrounding father's oblique hearsay reference (did he mean "Mohican" or "Mahican" or "Mohegan"?) the delay in this case may, unfortunately, be substantial.