*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-418

APRIL TERM, 2015

In re R.A., Juvenile          }    APPEALED FROM:

} 

}    Superior Court, Orleans Unit,

}    Family Division

} 

}    DOCKET NO. 76-10-12 Osjv

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Mother and father separately appeal from the judgment of the superior court, family division, terminating their parental rights to the minor R.A. Mother contends that (1) the evidence was insufficient to prove a change of circumstances based on stagnation of her parenting abilities; (2) the evidence failed to support the court's conclusion that mother could not resume parenting responsibilities within a reasonable time; and (3) the court improperly relied on hearsay evidence. Father contends the trial court erroneously: (1) overlooked evidence that the Department for Children and Families (DCF) obstructed his progress; and (2) rejected a transfer of custody to R.A.'s maternal grandmother. We affirm.

The trial court's findings may be summarized as follows. R.A. was born in December 2011. Mother and father were unmarried and were nineteen and eighteen years old, respectively, at the time. They lived with R.A.'s maternal grandmother for the first three to six months after R.A.'s birth, and then moved to an apartment. R.A. was small at birth but gained weight until his six-month check-up, when his pediatrician became concerned about his weight loss. The pediatrician prescribed medicine for acid reflux, showed the parents how to administer it, and set up another appointment. At the next appointment, the parents indicated that they had stopped the medicine. The doctor again prescribed use of the medication and advised the parents to cut back on apple juice, replace it with formula, and begin feeding solid foods.

R.A. continued to lose weight, and was hospitalized in late September 2012, when he was nine months old, after it was determined that he was severely dehydrated and had sustained a significant weight loss. With the use of acid-suppression medication and regular feedings, R.A. gained weight rapidly in the hospital, and was discharged to his parents in early October 2012. During an office visit about a week later, however, R.A.'s pediatrician became concerned that his weight gain had slowed, and that the parents were not following the feeding regimen or understanding the child's cues. They appeared unable or unwilling to follow feeding and medication instructions, failed to recognize the child's signs of hunger, and disputed the cause of his weight loss.

The pediatrician notified DCF, which took custody of R.A. under an emergency care order. After a few days in foster care, the child was placed with his maternal grandmother.

Daily contact with R.A. was made available to the parents, but they visited only sporadically during the next several months. Although R.A. thrived in the care of his grandmother, she advised DCF that she was overwhelmed by the need to care for an autistic son and could not continue. DCF suggested a residential placement at Lund Family Center for mother and R.A., but mother was unwilling. Accordingly, R.A. was placed in foster care in February 2013.

The parents stipulated that R.A. was a child in need of care or supervision (CHINS) in February 2013. The court adopted a disposition plan later that month which identified concurrent goals of reunification or adoption by June 2013. The plan called for the parents to form a bond with R.A., successfully complete a parent education program at Lund, work with Easter Seals to learn to identify and meet the child's physical, emotional and developmental needs, and learn how to feed the child in order to meet his caloric needs. Specifically, they were required to listen to those providing care for the child, learn how to read the child's cues, and meet his needs according to those cues. The plan required parents to demonstrate an ability to partner with service providers, identify and access family supports, and meet with a domestic-violence specialist concerning the dynamics in their relationship with each other that may affect R.A.'s ability to stay calm. In addition, father was to secure stable housing and employment. R.A. was found to have significant global developmental delays in cognitive, social, communication, and motor-skill functions, and services were established for his benefit as well.

Mother moved to Lund in March 2013, and after a period of gradual transition, R.A. joined her in April. During her stay, mother was initially resistant to being there. By the end of June 2013, R.A. had lost weight. Mother was responsible for ensuring that R.A. received Pediasure, which he had been prescribed to take twice a day to help with weight gain. She did not consistently feed it to him, and failed to timely refill the subscription. As a result, staff developed a new plan that included observation by staff of feeding times to ensure that Mother was feeding R.A. the Pediasure. DCF advised mother that failure to comply with the feeding regime put R.A.'s health at risk and jeopardized reunification efforts.

While at Lund, mother did make progress in the area of personal growth. However, she was resistant to parenting education in general and missed organized weekend activities such as story time at the library, playground activities, and waterfront activities, instead choosing to leave the child with a counselor and go out with father. She resisted applying sunscreen or using a sunhat for R.A., did not consistently keep food logs to track caloric intake, declined to have R.A. weighed, and declined to put R.A. into on-site day care for some period of the day so she could access recommended programs. On two occasions, mother was observed to be aggressive with R.A., dealing roughly with him after he fell. Mother also canceled an important and long-scheduled appointment with R.A.'s pediatrician because she was unwilling to walk or take public transportation to the appointment. Overall, mother was consistently non-compliant with activities that would help the child develop.

Father visited often, played consistently with R.A., and attended team meetings. However, he did not follow the plan pursuant to which he was to arrive at 8:30 a.m. to care for the child while mother attended programming. Father refused to take a parenting class, and he had angry outbursts with staff in the presence of R.A. As a result, he was asked to leave Lund and was not allowed back for a period.

As a result of mother's failure to progress in connection with her behaviors relating to care for R.A., DCF decided it would no longer support mother and the child remaining at Lund.

The Lund family educator agreed with this decision, although mother's therapist did not. In early September 2013, DCF returned the child to his former foster home, where he has since remained. DCF filed a TPR petition later that month.

In October 2013, DCF convened a meeting to explore the possibility of a permanent family placement. R.A.'s maternal grandmother initially agreed to provide a permanent home for R.A., but shortly thereafter decided that she could not do so in light of the considerable responsibilities she already had caring for her autistic son.[*]

After R.A. was placed back with his foster parents, the parents re-engaged with a Family Time coach, mother attended many of R.A.'s therapy appointments, and father engaged in therapy to address issues related to anger management. In the context of the family-time visits, mother was able to meet R.A.'s needs and was nurturing, and father played with the child. The child was happy to see both parents.

In the meantime, R.A. became fully integrated into his foster-family household, which includes two other foster children. He had a busy schedule of attending various appointments for physical therapy and occupational therapy with his foster parents. R.A. was also gradually gaining weight and strength, and was improving his speech. R.A.'s foster parents indicated an interest in adoption.

The trial court held an evidentiary hearing on the TPR petition over four days between February and May 2014. In a hearing at the end of April, grandmother testified that she was now in a position to care for R.A. on a permanent basis. At the end of the hearing, R.A.'s guardian ad litem (GAL) expressed ambivalence in making a recommendation. Acknowledging a concern about how long it would take to determine whether mother was able to safely parent R.A., the GAL ultimately recommended giving mother more time to establish that she was able to parent the child. This recommendation was driven in part by the belief that mother and father were no longer together. The trial court found that it was not clear how long the parents' separation, disclosed on the last day of hearing, would last.

The court issued its written decision in October 2014. Based on the foregoing, the trial court concluded that, despite recent positive interactions in structured settings, neither parent had demonstrated real improvement in their parenting skills and in their abilities to meet the child's physical, emotional, and developmental needs, despite opportunities to do so over a substantial period of time. The court thus concluded that there had been a substantial change of circumstances based on a finding of stagnation.

Turning to the statutory criteria for evaluating the best interests of the child, the court concluded that, given R.A.'s age and need for stability and permanence, a reasonable period of time for the parents to resume parental responsibilities had passed by the time R.A. was removed

---

[*] Father contends that grandmother's testimony was somewhat different. She claimed that she needed thirty days to get ready for R.A., and that DCF refused her request. A caseworker with DCF testified that, to the contrary, grandmother changed her mind due to the burden of caring for her son. The issue was not significant in the court's decision, which was not focused on the reason that R.A. was placed with his foster parents rather than with his maternal grandmother, but rather with the fact that he had been in a different, stable placement for an extended period of time, and that "another disruption" was not in his interests.

from Lund, following a year in which the parents had made little progress in their parenting abilities. Father had refused to engage in educational programs to address R.A.'s needs, particularly his nutritional and developmental challenges, and mother's progress to date was minimal. Although the court noted that R.A. was attached to mother and enjoyed playing with father, and that both parents had made some recent positive efforts, it could not conclude that either would be able to resume parental responsibilities within a reasonable time, if ever. The court also found that R.A. has bonded with his foster parents, and well-settled into their home. The court acknowledged that this is a difficult case, but concluded that given R.A.'s age and history, the passage of time, and his need for permanence, it was not in his best interests to allow more time for the parents to demonstrate an ability to resume parental duties.

Finally, the court noted that an argument was made "in passing" at the hearing to transfer custody to the maternal grandmother based on her testimony that she had obtained additional assistance for her autistic son and was now able and willing to care for R.A. Assuming that it had the authority to do so, the court found that such a placement was not in R.A.'s best interests. The court explained that eight months of living continuously in his foster family had passed, and eighteen months of DCF custody, before grandmother's willingness to care for R.A. on a permanent basis was made known. The court was unwilling to create yet another disruption to R.A.'s stability, and the court concluded that the criteria for creating a permanent guardianship were not met. Accordingly, the court granted the State's petition to terminate parental rights. As noted, mother and father have filed separate appeals from the judgment.

Mother first contends the trial court's conclusion regarding stagnation was not supported by the evidence because it improperly failed to consider the child's circumstances, and in particular the fact that his acid-reflux condition had improved. The implication of mother's argument is that mother's ability to address R.A.'s medical condition was no longer a necessary or proper measure of her progress. See In re S.R., 157 Vt. 417, 421 (1991) (noting that "[s]tagnation is the passage of time with no improvement in parental capacity to care properly for the child").

As the court here noted, the CHINS adjudication was based on the child's hospitalization for acid reflux and inadequate caloric intake and the parents' inability or unwillingness to respond to the child's hunger cues, maintain a regular feeding schedule, and take responsibility for addressing the child's needs. Despite the child's subsequent improvement while in the care of his maternal grandmother and his foster parents, these remained significant concerns which the parents' plan of services was designed to address. Over a period of many months, parents were responsible for ensuring R.A.'s caloric intake; at every juncture, they failed to adequately respond to his needs, even with extensive coaching. Accordingly, the finding of changed circumstances based on a failure to make any significant improvement in parenting abilities was proper.

Mother further asserts that the evidence was insufficient to support the conclusion that she could not resume parental responsibilities within a reasonable time. We will uphold the trial court's findings unless clearly erroneous, and its conclusions if reasonably supported by the findings. In re M.M., 159 Vt. 517, 522 (1993). Mother relies on evidence that, at the time of the termination hearing, the causes of R.A.'s inability to thrive had "abated," the child's developmental needs were being met, and mother was "supportive" of the programs that were assisting in these efforts.

4

The trial court acknowledged that, since the child's removal from Lund and placement in foster care, his health had improved and mother had made positive efforts to attend Family Time coaching and some of R.A.'s therapy appointments. We have emphasized, however, that this issue must be viewed from the perspective of the child's paramount needs for permanence and stability. Here, mother has made minimal progress over time, and the prospect of acquiring the capacity to independently and safely care for the child is distant, if achievable at all. See id. at 524 (holding that, although parent had recently made "some progress," the trial court had properly "elevate[d] the best interests of the dependent child" where parent's progress was "insufficient . . . and [the] ability to act independently is many months away"); see also In re J.S., 168 Vt. 572, 574 (1998) (mem.) (upholding termination of parental rights "given the children's tender age and exceptional needs, and the parents' continued failure to effect meaningful changes in their lives").

In this case, the trial court found that mother and father made very little progress in meeting R.A.'s basic nutritional needs for the first eight months after DCF intervention. While mother and father's parenting skills had improved in the context of "highly structured and supervised" settings, the evidence supports the trial court's conclusion that parents were not prepared to resume parental responsibilities within a reasonable time. We thus find no basis to disturb the court's conclusion in this regard.

Finally, mother argues that the trial court erred in admitting hearsay statements throughout the course of the proceedings. Mother also argues that the trial court's ruling was improperly based on that testimony. See In re A.F., 160 Vt. 175, 181 (1993) (hearsay evidence is admissible in a termination proceeding, but it may not be the "sole basis for termination of parental rights"); see also 33 V.S.A. § 5317(b) (providing that "[h]earsay may be admitted and may be relied on to the extent of its probative value" in disposition hearing). In particular, mother challenges the court's admission and consideration of four statements, and argues that this Court should rule that hearsay is inadmissible in a termination proceeding.

Mother did not raise this legal argument below, and it is therefore not preserved for review on appeal. See In re D.C., 157 Vt. 659, 660 (1991) (mem.) (observing that "issues, including those with constitutional dimensions, are waived by parties unless raised" in trial court). Moreover, none of the four instances of alleged hearsay testimony cited by mother played a significant role in the court's decision.

First, mother argues that the court improperly allowed and considered unobjected-to testimony by a family educator from Lund regarding a report from another family educator that mother had pulled R.A.'s arm too aggressively after he tripped and fell during a group outing. The impact of this single instance on the court's overall analysis of mother's progress at Lund was minor. Even if mother had objected to the testimony and even if the trial court's admission of the testimony was erroneous, it would be harmless error.

Second, mother challenges the court's consideration of testimony from a DCF worker that mother knew about the pediatric appointment that she canceled for a week prior to the appointment. Although this testimony followed a more general objection, the specific testimony was not objected to. Moreover, the statement in question conveys the exact same information testified to without reliance on hearsay by the DCF family educator who had firsthand knowledge of the circumstances, and mother never claimed she did not know about the

appointment. Even if the court had erred in admitting this evidence, any error would have been completely harmless.

Third, mother points to testimony by the DCF caseworker that a foster-parent trainer reported to her that grandmother had voiced to her worries about taking R.A. into her home. Mother did object to this testimony. The trial court did not cite this testimony in its findings, and based its rejection of grandmother as a permanent placement option on the fact that grandmother offered to serve as a permanent placement for R.A.—or reoffered, after concluding that she could not care for the child—very late in the process, after R.A. had already experienced many disruptions in the quest to promote reunification. The trial court's ruling was based on concerns for stability in the child's life, not this statement. Even if the trial court had erred in admitting this testimony, the error would be harmless.

Finally, mother objects to the trial court's consideration of the DCF caseworker's testimony that after mother informed the caseworker that mother and father had broken up, she received a call from someone whom she did not identify informing her that mother and father were not, in fact, separated. The trial court did not rest its decision on its understanding of mother's and father's relationship status. The court's decision rested, rather, on its finding that neither parent was prepared to resume parental duties within a reasonable time.

Father raises two claims. First, he contends that the trial court overlooked the fact that DCF obstructed the parents' ability to make progress. See In re J.T., 166 Vt. 173, 180 (1997) (recognizing that DCF assistance is "a factor in determining whether [the State] met its burden of showing that a parent is unlikely to be able to resume parental duties within a reasonable period of time"); S.R., 157 Vt. at 422 (observing that "factors beyond the parents' control could not support termination of parental rights"). Father relies in this regard on his Easter Seals Family Time coach, who testified that she had spoken with her supervisor about increasing the parents' time with R.A. but it was her "understanding that it's not DCF protocol to do that during a TPR process."

The claim is unpersuasive. First, the witness's testimony was based on second-hand information, and was not sufficient to support a conclusion about DCF policy. More important, the court made it clear that, "[g]iving due consideration to the progress" recently made by the parents with the Family Time coach, it remained unlikely that they could, within a reasonable time, "assume parental duties beyond that which occurs in the highly structured Family Time setting." As noted above, every time mother or the parents together were responsible for caring for R.A., they were unable to identify and meet his needs. The parents had a year between the time R.A. was first hospitalized and the time he was placed with a foster family for the second time, after mother stopped the program at Lund, during which to establish their ability to care for R.A. Given this record, we conclude that the trial court's failure to conclude that father had been prevented by DCF from demonstrating his progress and securing reunification was not an abuse of discretion.

Father also claims that the court erred in rejecting the suggestion of a transfer of custody to R.A.'s maternal grandmother. He asserts that such a transfer was within the court's authority, and would be supported by the evidence. Contrary to father's claim, there is no indication in the record that the court's "uncertainty" about its authority colored its consideration of the request. Nor is there any basis to find that the court's decision was unsupported. As noted, the court acknowledged the grandmother's testimony that she was willing and able to adopt or accept a

6

guardianship, and recognized R.A.'s relationship with her, but found that the child had not lived with her for over fifteen months, that he was thriving in his foster home, that he required stability rather than "another disruption," and that the basis for a permanent guardianship were not established. This was adequate to support the ruling. Although father questions the accuracy of the court's earlier observation that grandmother was "unaware of the expense of adoption," there is no indication that this played any role in the court's ruling. Accordingly, we find no basis to disturb the judgment.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice