*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2016-177

SEPTEMBER TERM, 2016

| | | |
|---|---|---|
| In re N.R. & L.B., Juveniles | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Windsor Unit, |
| | } | Family Division |
| | } | |
| | } | DOCKET NO. 107/108-6-14 Wrjv |

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights in N.R. and L.B. She argues that the court erred in concluding that she could not parent the children within a reasonable period of time. She also asserts that the State failed to notify the court that she had identified her children as Indian, which denied her the heightened protections of the Indian Child Welfare Act (ICWA), even if the children are not actually Indian. We affirm.

Mother's rights in three older children were terminated in 2006 based on mother's substance abuse, untreated mental health issues, homelessness, multiple moves, lack of engagement in services, and lack of consistent contact with the children. Shortly thereafter, N.R. was born; L.B. was born in June 2014. An emergency care order issued in June 2014 based on mother's bizarre behaviors and her observed inability to provide adequate and safe care for L.B. upon his birth. In October 2014, the court found by clear and convincing evidence that the children were in need of care or supervision (CHINS). The court explained that mother had exhibited bizarre and emotionally volatile behavior and had unpredictable mood swings, and that she had made bizarre, threatening, and improper statements in front of the children. The court determined that, when agitated, mother was not responsive to the children's needs, she could not provide the children with essential emotional support and stability, and her extreme hostility and distrust of all service providers had harmed the children. We affirmed the trial court's CHINS decision on appeal. See In re N.R. & L.B., No. 2014-446, 2015 WL 1760371 (Vt. Apr. 10, 2015) (unpub. mem.), https://www.vermontjudiciary.org/LC/unpublishedeo.aspx. We concluded that the evidence supported the court's findings as to mother's profound mood swings and "bizarre and unpredictable" behaviors, which supported the conclusion that mother could not provide for the children's emotional welfare.

In November 2014, DCF moved to terminate mother's rights. Following hearings in March and April 2016, the court granted its request. The court incorporated its CHINS findings into its decision, and made numerous additional findings. Ultimately, the court concluded that there was no likelihood that mother could parent N.R. and L.B. within a reasonable amount of time. It explained that despite numerous supports over the years by various providers, mother made little if any progress. The issues that existed at the beginning of the case continued. Indeed, some of the issues that led to

the termination of mother's rights in three other children in 2006 decisions persisted as well, specifically, untreated or undertreated mental health challenges that directly affected her ability to provide safe parenting, along with housing instability, failure to engage successfully in recommended services, and no ability to accept and use the tools demonstrated by the Family Time coach to effect a safe parenting style despite a consistent engagement with Family Time Coaching. Mother took no responsibility for her role in failing to keep N.R. safe both physically and emotionally. Mother had not seen L.B. for almost a year and had only seen N.R. once in five months. For these and other reasons, the court concluded that termination of mother's rights was in the children's best interests. This appeal followed.

Mother argues that the court erred in concluding that she would not be able to parent the children within a reasonable period of time. She maintains that the State failed to prove that she had mental health issues because the State's witnesses failed to identify her precise mental health issues, or explain why they were qualified to testify that mother had mental health issues. Mother contends that the State failed to show that her mental health issues affected her ability to parent. She cites evidence that she believes demonstrates her ability to parent N.R., and notes that she has been parenting another child, born in June 2015. Additionally, mother asserts that the court failed to adequately consider her medical history, and she complains that she was held to an unreasonable parenting standard in light of her medical issues. Mother also complains that there was little evidence concerning her failure to engage in services, her inability to use the tools demonstrated by the Family Time coach, and her housing instability.

We find no error. The evidence overwhelmingly supports the trial court's conclusion that mother cannot parent N.R. and L.B. within a reasonable period of time, and that termination of her rights was in the children's best interests. See In re G.S., 153 Vt. 651, 652 (1990) (mem.) (explaining that as long as trial court applied proper standard in evaluating child's best interests, its findings will stand unless clearly erroneous and conclusions will be affirmed if supported by findings).

First, the absence of any formal diagnosis of a particular mental illness is immaterial. Mother's mental health issues are illustrated by her behavior and no expert testimony on this point was required. The court recounted numerous incidents that speak to mother's mental health challenges. In June 2013, for example, a police officer investigating mother for domestic assault found mother to be in a highly volatile and hostile state; she threatened emergency services personnel, slipped out of her handcuffs several times, and drank from a bottle of windshield washer fluid before being restrained. N.R.'s maternal aunt called DCF to express concerns about mother's emotional stability, her statements expressing extreme hostility and threats toward DCF personnel, and plans to move to a secret location with N.R. to avoid DCF involvement. While mother was in the hospital for L.B.'s birth in June 2014, a nurse observed that mother was often agitated and she made threats against DCF and hospital personnel. Mother could not care for the baby when agitated. Mother said that she hated children, that crying babies frustrated her, and that she was going to run away with the children so that DCF could not find them. Mother repeated these types of statements to various individuals assisting her. During one visit in July 2014, mother threatened the Easter Seals coach, threatened to follow the workers home and set their houses on fire, and threatened to hurt her DCF social worker. She told N.R. that DCF social workers were evil and stole children and sold them to the highest bidder on the black market. In the children's presence, mother referred to obtaining guns and hurting people, comments that the Family Time coach believed were emotionally harmful to N.R. Mother's visitation was suspended due to mother's erratic behaviors, threats, and inappropriate commentary in the children's presence. When visits resumed, mother was prone to talk about conspiracy theories and make inappropriate comments to the children, such as telling N.R. that she was being "abused" in the foster home, that she would "snatch" N.R., and that mother's civil rights

2

were being violated. Mother told L.B. that he was not as smart as her other children, he was fussier, and ugly because he had a flat head. When L.B. needed a diaper change, mother complained that he was being difficult and ruining the visits. The record is replete with instances of mother's mental instability, all supported by evidence in the record. The detrimental effect of her behavior on the children and its impact on her ability to parent are obvious.

The court did not ignore mother's medical history in reaching its conclusion, nor was mother held to an unreasonable parenting standard in light of her medical issues. The court noted that mother had had a stroke in 2009 and that she had some residual physical effects. A neuropsychological evaluation in 2012 resulted in a determination that overall mother's "performance was intact in most areas of cognitive functioning assessed and in many instances in above average ranges." A doctor who evaluated mother for Social Security disability benefits opined that the effects of mother's stroke resulted in very minor cognitive impairments and had little effect on mother's day-to-day living. He described mother has having a high level of anger and suspicion and found her unable to control her comments to the degree that one would expect. The doctor stated that mother made "cutting" comments and agreed that such comments may hurt a child. The court accepted the doctor's observations as credible and concluded that they confirmed the observations of others as to mother's behaviors and preexisting personality traits noted in the 2006 TPR. Mother's medical history was adequately considered by the court.

Mother argues that she can parent, as evidenced by the fact that she still has custody of her latest child and that she parented N.R. before she was taken into custody. These arguments go to the weight of the evidence, a matter reserved exclusively for the trial court. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights . . . ."). As to mother's parenting of her latest child, we note that the court found that mother moved to New Hampshire based on concerns that her latest child would be removed from her care upon birth, and she has refused to disclose her address to DCF or to Easter Seals in New Hampshire. The court also found, among other things, that N.R. was sexually abused while in mother's care, that mother did not immediately notify the police of the assault, and she resisted DCF's recommendation to obtain counseling for N.R., who was experiencing fears relating to the assault. Mother told the therapist in front of N.R. that counseling was unnecessary, that she was only there because DCF required it, and that it was best for N.R. to forget the assault. While the therapist believed that the therapy was benefiting N.R., mother terminated counseling in 2013.

The court's conclusion regarding mother's inability to use any of the tools provided by the Family Time Coaching is also well-supported by the record. Indeed, mother's Family Time Coaching was suspended on several occasions due to mother's erratic behaviors, threats, and inappropriate commentary in front of the children. As previously noted, mother talked about conspiracy theories during visits, and continued to make inappropriate comments to the children. She struggled to nurture L.B. She made numerous hurtful comments to the children, which caused N.R. to cry, sometimes for hours at a time after visits. Mother told N.R. that if the visits were suspended, it was her fault. There are numerous additional examples of mother's inability to use any of the tools provided by the Family Time Coach. The court credited the Family Time coaches' testimony that mother was not able to integrate and apply what was demonstrated to her, and that mother made no progress. In support of her argument to the contrary, mother cites testimony from her friend to the effect that visitation with the children had gone well. Mother also notes that she took a class before L.B. was born and another class after L.B. was removed from her custody. These arguments go to the weight of the evidence. The court provided extensive detail in support of its conclusion, discussed above. While mother disagrees with the court's conclusion, she fails to demonstrate any error.

3

We reach the same conclusion as to mother's failure to successfully engage in recommended services. Mother contends that the court erred because she took N.R. to therapy, sought a companion dog for N.R., and sought help from New Hampshire social services for her latest child, and sought therapy for herself. These arguments simply quarrel with the trial court's assessment with the weight of the evidence, and ignore all of the contrary evidence identified by the trial court. As set forth above, mother did not successfully engage in Family Time Coaching. She did not voluntarily take N.R. to a therapist after N.R. was sexually assaulted; she was asked to do so by DCF. Mother stopped the counseling after two sessions. Mother refused for over a year to participate in any mental health counseling, then participated for nine months, only to stop again for a year before the TPR hearing. The court did not err in concluding that mother failed to successfully engage in recommended services.

Mother does not challenge the court's findings that she took no responsibility for her role in failing to keep N.R. safe both physically and emotionally, or that she had not seen L.B. for almost a year and had only seen N.R. once in five months. Indeed, mother does not challenge the court's finding that in June 2015, after her latest child was born, she told the Family Time Coach that it was time to transfer custody of L.B. to his foster mother and she did not see L.B. thereafter. She does not deny saying to N.R., who suggested that mother might want to move closer to her one-time foster placement, "why would I move there?" After N.R. moved to Massachusetts in November 2015, mother had no further visits with her except one, by which time N.R. was back in Vermont after her foster parent suffered a drug overdose.

The court's key findings are supported by the evidence, and even if there is little support that mother continues to suffer from housing instability (mindful that she has not disclosed her address), any error is harmless. The remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision to terminate the mother's parental rights, as a matter of law. See In re A.F., 160 Vt. 175, 178-79 (1993) (holding that erroneous finding does not require reversal where other evidence supports TPR decision).

We thus turn to mother's assertion that she was entitled to ICWA's protection even if the children are not actually Indian. Mother contends that she told her Family Time Coaches in July 2014 that she had Indian blood. Specifically, the Family Time coach testified that, during a July 2014 visit, mother was extremely agitated and her behavior was escalating. In front of the children, mother began talking about "what her children were worth on the black market." She "believed DCF was kidnapping children to sell them on the black market, and she was talking about the worth of her children, that maybe they would fetch less because they weren't Anglo because she has Native American blood." She went on to say that L.B. would be worth less because his eyes were turning from blue to grey. Mother asserts that at some point, she told DCF that the children could be Indian and eligible for membership in the Choctaw Indians of Oklahoma. She indicates that this must be so because the State produced a letter dated February 2015 from the Mississippi Choctaw Indians, which stated that the children were not part of their tribe. Had she been informed of this letter, mother states, she would have told DCF and the court that this was the wrong tribe, the correct one being the Choctaw Indians of Oklahoma. Mother cites the Family Time coach's trial testimony as the "third time" in which she gave notice that her children might be Indian.

The record indicates that following the court's termination decision, mother moved for a new trial. She argued in relevant part that she would show that DCF violated ICWA, 25 U.S.C.A. §§ 1901-1963, by dismissing her report that she might be eligible for membership in the Choctaw Nation of Oklahoma tribe. The trial court denied the motion. It found that the State had filed a copy of a letter

4

from the Choctaw Nation of Oklahoma, which responded to the State's inquiry about both parents and/or their children being registered with the tribe. The letter indicated that neither parent was a member of the tribe and therefore N.R. was not a member. See id. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe"). L.B.'s father was unknown, and L.B. was therefore not eligible for membership through his biological father's side as parentage had not been established. Id. § 1903(9) (explaining that term "parent" under ICWA "does not include the unwed father where paternity has not been acknowledged or established"). The court found that the State had complied with investigation of ICWA claims, the tribe had determined that neither child was a registered member, and no further action was necessary. As indicated, the State had also obtained a letter from the Mississippi Band of Choctaw Indians stating that the children were not part of that tribe. The court denied mother's motion for a new hearing on the TPR based on the State's alleged failure to comply with ICWA.

Mother fails to show that the court erred in reaching this decision. Assuming arguendo that the State should have investigated whether the children were Indian earlier, any error was harmless. In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 ("We have employed the harmless error standard in termination cases, and, under that standard, an error warrants reversal only if "a substantial right of the party is affected." (citation omitted)). Indeed, the remedy for any failure to comply with the notice provisions of ICWA would not be the reversal of the TPR decision, but rather a remand to determine if the children were Indian. See In re J.T., 166 Vt. 173, 184 (1997) (rejecting argument that TPR should be reversed due to court's failure to provide notice of possibility that child might be Indian under ICWA, explaining that such remedy not warranted where only error is failure to provide notice and there is no strong showing that ICWA applies; appropriate remedy was remand to trial court for notice to be given to Bureau of Indian Affairs and if children determined not to be Indian, original TPR order would stand). It has already been established here that the children are not Indian. Mother was not entitled to the protections of ICWA, and she cannot claim error because she did not receive them. Mother failed to show that a new trial was warranted. See Pirdair v. Med. Ctr. Hosp. of Vt., 173 Vt. 411, 414 (2002) (denying motion for new trial where plaintiff "failed to demonstrate that letting the judgment stand would result in a miscarriage of justice").

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice